## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*, | Bankr. Case No. 18-10601 (MFW) |
| Debtors. | |
| WEDIL DAVID, DOMINQUE HUETT, ALEXANDRA CANOSA AND AIMEE MCBAIN, | Civ. Case No. 21-00171 (MN) |
| Appellants, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.* and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Appellees. | |

## EMERGENCY MOTION BY NON-CONSENTING SEXUAL MISCONDUCT CLAIMANTS FOR STAY PENDING APPEAL OF CONFIRMATION ORDER

Wedil David, Dominque Huett, Alexandra Canosa and Aimee McBain (collectively, the "Non-Consenting Sexual Misconduct Claimants"), by and through their undersigned counsel, hereby file this motion, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure, for a stay pending appeal of the Bankruptcy Court's Order [Bankr. D.I. 3203][1] (the "Confirmation Order") Confirming Plan Proponents' Fifth Amended Joint Chapter 11 Plan of Liquidation [Bankr. D.I. 3182] (the "Plan"). In support of this motion, the Non-Consenting Sexual Misconduct Claimants state as follows:

---

[1] References to "Bank. D.I." are to the bankruptcy docket for the Debtors in the United States Bankruptcy Court for the District of Delaware, Case No. 18-10601 (MFW).

{00030167. }

## PRELIMINARY STATEMENT

1.      The Non-Consenting Sexual Misconduct Claimants are victims and survivors of Harvey Weinstein seeking justice against Harvey Weinstein as well as the people and institutions who, they allege, enabled him in committing rape, sexual assault and other acts of sexual misconduct over decades, including while he was co-CEO of the Debtors.  Three of the Non-Consenting Sexual Misconduct Claimants, for example, have asserted claims against certain former board members of The Weinstein Company, LLC ("TWC"), alleging that they were negligent in failing to supervise Harvey Weinstein in pursuing decade's long sexual misconduct ranging from rape and sexual assault to sexual verbal harassment.  In pursuing their claims against Weinstein *and* the men who helped him, the Non-Consenting Sexual Misconduct Claimants seek monetary consideration, vindication by a jury, and the promise of improving the work environment for women.

2.      The Plan, however, incorporates two forms of extraordinary relief—overly broad Third Party Non-Consensual Releases and a Channeling Injunction—that will forever prevent the Non-Consenting Sexual Misconduct Claimants from further pursuing their claims.  Such relief is neither legally nor factually appropriate in the context of these cases.  The Third Circuit in *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F. 3d 203 (3d Cir. 2000) ("*Continental*") held that certain requirements must be met for a chapter 11 plan to include non-consensual third party releases.  Those requirements are fairness, necessity to the reorganization, and specific factual findings to support the releases.  The Plan Proponents did not satisfy those requirements and the Plan containing Non-Consensual Third Party Releases should not have been confirmed.

3.      The Debtors are defunct, have no employees or operations.  The Plan was filed not to save jobs or preserve enterprise value but to protect Former Representatives and Insurance

Companies.  Notwithstanding the fact that the Debtors just as easily could be liquidated in chapter 7, by adopting the Plan, the Bankruptcy Court has deployed the most robust legal and equitable protections in the Bankruptcy Code.  The extraordinary relief the Plan provides is not necessary to the Debtors' reorganization because the Debtors are not reorganizing; they are liquidating.

4.      The Plan's robust protections principally were bargained-for by and benefit third parties; *e.g.*, insurance companies, former directors and officers and a broad range of unidentified third parties.  The Plan does not adjust the debtor-creditor relationship because there is no debtor-creditor relationship.  In fact, the Debtors are administratively insolvent and lack sufficient resources to confirm a plan.  The Plan Proponents' reliance on section 105 is misplaced.  The Plan Proponents should not be able to confer better rights to third parties; *i.e.,* a *de facto* discharge, when the Debtors themselves are not entitled to a discharge.  Voting on the Plan was skewed. Women who were raped and sexually assaulted and thereby entitled to a greater voice in plan formulation were denied that voice and were treated as nominal creditors for voting purposes. Class 4, holders of Sexual Misconduct Claims, was overly broad, consisting of claims ranging from rape and sexual assault to victims of sexual verbal harassment.  Votes solicited by the Plan Proponents on this tainted basis does not cure the fact that the non-consensual third-party releases and the channeling injunction in the Plan are unlawful under the Bankruptcy Code and Third Circuit precedent.

5.      The Bankruptcy Code draws a distinction between debtors that are truly reorganizing and therefore entitled to a discharge and debtors that are simply liquidating and not entitled to a discharge.  The Debtors here are liquidating and are not entitled to a discharge.  *See* 11 U.S.C. § 1141(d)(3).  It therefore stands to reason that persons and entities who have *not* put themselves before the Court, have *not* opened their books and records to scrutiny, and have *not*

been charged to act as fiduciaries for the benefit of creditors should *not* receive the full legal and equitable benefits the Bankruptcy Code has to offer and greater benefits than the Debtors are entitled under law.

6.      The Non-Consenting Sexual Misconduct Claimants object to the Plan's Third Party Non-Consensual Releases and the Channeling Injunction.  These Plan provisions have the effect of freeing ultra-affluent former board members of TWC from any accountability or liability for their alleged supervise Harvey Weinstein and stop his predatory sexual misconduct.  A release sounds in contract.  The giving up of legal rights must be knowing, voluntary and for consideration. It requires some manifestation of assent.  The Non-Consenting Sexual Misconduct Claimants do not agree to release these former directors and a release should not be forced upon them by the Bankruptcy Court.  The filing of a bankruptcy does not transform a state law contract right into a federal remedy that may be granted to third parties over the objection of the person asserting the claim.

7.      If permitted to stand, the Plan would open the door wide for mischief in adjusting the insurance company-tort claimant relationship in the context of a moribund debtor.  The Debtors here have insufficient available assets to confirm a plan.  The Insurance Companies have towers of insurance but, acting in their own self-interest, want to fund the smallest amount to satisfy all potential claims against them.  The Debtors have little or no bargaining power because they have no options other than chapter 7.  The Insurance Companies at all times controlled the wallet that contained the sole source of funding to make any plan feasible.  The Insurance Companies demand, as a condition precedent to funding any amount, that the Bankruptcy Court grant them the fullest relief this Court may provide.  That does not make the funding "necessary to the reorganization." That requirement should not be watered down to mean the lowest amount necessary to fund a plan

of liquidation. Showing that tort claimants fare better under the Plan than in chapter 7, as the Debtors maintain, is a false comparison.  They always will fare better even if the plan pays 1 cent more on the dollar.  There must testimony as to how they fare if they are permitted to pursue their claims in the tort system. That answer anecdotally is provided by the Insurance Companies funding the Plan to *avoid* the tort system.

8.      The Third Circuit's standard "necessary to the reorganization" was developed in the chapter 11 bankruptcy case of *Continental*, a true reorganization, and adjudicated in the context of other circuit court decisions that addressed non-consensual third party releases in mass tort liability cases.  It is respectfully submitted that "necessary to the reorganization" must mean more than funding the minimum amount to make a liquidating chapter 11 plan feasible. There must be a distinction drawn between "necessary to the reorganization" and making a plan "feasible," a much lower standard.

9.      The non-consensual third-party releases are also not fair, particularly because Non-Consenting Sexual Misconduct Claimants essentially were disenfranchised in the voting process. Section 1126(c) of the Bankruptcy Code is intended to provide creditors with larger claims a larger voice in voting to accept or reject the plan because they have more at stake.  In these cases, women who were raped and sexual assaulted should have a larger voice than victims of sexual verbal harassment or "inappropriate conduct."  But the unfair voting scheme that confirmed the Plan valued *all* claims in Class 4 at $1 and thereby secured acceptance by Class 4.

10.      The Plan Proponents also had the burden of presenting evidence for the Court to make specific findings that the Released Parties made "substantial contributions" to the Plan and showed an "identity of interest" between the Released Parties and the Debtors. *See In re Zenith*

*Elec. Corp.,* 241 B.R. 92 (Bankr. D. Del. 1999)("*Zenith*");[2] *In re Congoleum Corp.*, 362 B.R. 167, 192 (Bankr. D. N.J. 2007). As described below, the Debtors failed in that burden.

11.     A stay of the Confirmation Order is necessary and appropriate for the Non-Consenting Sexual Misconduct Claimants to exercise their appellate rights to seek to reverse the Confirmation Order to the extent it provides for Third Party Non-Consensual Releases and a Channeling Injunction that dramatically and adversely affect the rights and claims of the Non-Consenting Sexual Misconduct Claimants.

## JURISDICTION

12.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 158 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.  The relief requested herein is predicated on Rule 8007 of the Fed. R. Bankr. P.

## BACKGROUND

**A.     The Non-Consenting Sexual Misconduct Claimants**

*Wedil David*

13.     Wedil David, an actress, was raped by Harvey Weinstein in California in 2016, and is the plaintiff in *David v. The Weinstein Company LLC et al*, No., 18 Civ. 5414, pending in the United States District Court for the Southern District of New York.  Ms. David has asserted claims of assault, battery, sexual battery under Cal. Civ. Code § 1708.5, gender violence under Cal. Civ. Code § 52.4, sex trafficking 18 U.S.C. § 1591, negligence and negligent supervision against

---

[2] *Zenith* set forth five factors that should be considered to determine whether, notwithstanding 524(d), a plan may provide for releases by debtors of non-debtor entities, as follows: (1) the identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) whether the nondebtor has contributed substantial assets to the reorganization; (3) whether the injunction is essential to reorganization; (4) whether a substantial majority of the creditors agree to such injunction—specifically, whether the impacted class or classes have "overwhelmingly" voted to accept the proposed plan treatment; and (5) whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction (the "*Zenith Factors*").

Harvey Weinstein, The Weinstein Company LLC and The Weinstein Company Holdings LLC. Ms. David previously had asserted claims of negligence and negligent supervision against the following former directors and officers of the Debtors: Robert Weinstein, Lance Maerov, Richard Koenigsberg, Tarak Ben Ammar, Dirk Ziff, Tim Sarnoff, Paul Tudor Jones, Jeff Sackman, and James Dolan. The district court dismissed Ms. David's claims against the Former Representatives by decisions dated April 24, 2019 and December 19, 2019. *See David v. Weinstein Co. LLC*, No. 18-CV-5414 (RA), 2019 WL 1864073, at *1 (S.D.N.Y. Apr. 24, 2019); *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290 (S.D.N.Y. 2019). Ms. David has the right to appeal the dismissal of those claims, and intends to do so, when there is a final decision in her case within the meaning of 28 U.S.C. § 1291. However, under the Plan as confirmed, she will no longer have that option. Her case is currently in discovery.

***Dominique Huett***

14.     Dominique Huett, an actress and model, was sexually assaulted by Harvey Weinstein in California in 2010. Ms. Huett is the plaintiff in *Huett v. The Weinstein Company et al.*, No. 2:18-cv-6012, pending in the United States District Court for the Central District of California. Ms. Huett has asserted claims for negligence and sex trafficking 18 U.S.C. § 1591 against Harvey Weinstein and The Weinstein Company LLC. The district court denied Harvey Weinstein's motion to dismiss Ms. Huett's claims. *See Huett v. Weinstein Co. LLC*, No. 2:18 CV 06012, 2018 WL 6314159, at (C.D. Cal. Nov. 5, 2018). Ms. Huett's case has been stayed by the district court pending the disposition of criminal proceedings against Harvey Weinstein. *See Huett v. Weinstein Co. LLC*, 2:18 CV 06012, 2019 WL 2902494 (C.D. Cal. Feb. 28, 2019).

***Aimee McBain***

15.     Aimee McBain, an employee of the Weinstein company in 2017, filed a summons with notice, a New York State Court procedure in which a plaintiff can file a notice to satisfy a

statute of limitations without filing a full complaint. Ms. McBain has claims for a hostile work environment under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights ("NYCHRL) against the Debtors. She also has human rights law claims against certain former directors and officers of the Debtors, including former TWC co-CEO Robert Weinstein, who may be liable on an aiding and abetting theory. Ms. McBain's claims are not derivative of claims against the Debtors. The aiding and abetting theory under which Ms. McBain would proceed against the former directors was approved by one trial court in New York state court against Robert Weinstein. *See* Rehal v. Weinstein, No. 151738/2018, 2019 WL 2088435, at *5 (N.Y. Sup. Ct. May 13, 2019). However, under the Plan, she will not be permitted to pursue those claims.

### *Alexandra Canosa*

16.     Ms. Canosa, an actress, was raped and sexually assaulted by Harvey Weinstein on multiple occasions. Ms. Canosa is the plaintiff in *Canosa v. Weinstein et al.*, No. 1:18-cv-4115, pending in the United States District Court for the Southern District of New York. Ms. Canosa has asserted the following claims against Harvey Weinstein which have survived defendant's motion to dismiss (by order of the Honorable Paul A. Engelmayer, U.S.D.J. on January 28, 2019): Battery, assault, intentional infliction of emotional distress, sexual assault, false imprisonment, New York State Human Rights Law, New York City Human Rights Law, Trafficking Victims Protection Act, and California law claims. Ms. Canosa also asserted claims against various Former Representatives for negligent supervision, hiring and retention, aiding and abetting, New York State Human Rights Law, New York City Human Rights Law, quid pro quo harassment, hostile work environment, ratification, sex discrimination - disparate impact and hostile work environment based on sex. The district court dismissed all of Ms. Canosa's claims against the Former Representatives by decision dated January 28, 2019, which cannot currently be appealed

due to the finality rule, as Ms. Canosa's case is still ongoing by virtue of her other claims against other defendants. Her case is currently in discovery against Harvey Weinstein, The Weinstein Company, LLC and the Weinstein Company Holdings, LLC, which she has been aggressively pursuing.

**B.    The Confirmed Plan**

17.    The confirmed Plan contains certain provisions that are the subject of the appeal including, among others, the Third Party Non-Consensual Releases and the Channeling Injunction.

*Third Party Non-Consensual Releases*

18.    The Plan seeks the following Third Party Releases that affect the rights and claims of the Non-Consenting Sexual Misconduct Claimants:

> **7.2.2. *Releases by . . . Holders of Claims . . . .*** (ii) each present and former Holder of a Claim[1] …, will be **deemed** to unconditionally, completely, and forever **release, waive, and disclaim** the Released Parties of and from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including **any direct** or derivative claims asserted or assertable by or on behalf of … any Holder of a Claim … , any Claims or causes of action asserted by … any Holder of a Claim … that … any Holder of a Claim or Interest would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, matured or unmatured, accrued or not accrued, foreseen or unforeseen, **existing or hereinafter arising**, in law or equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities, or these Chapter 11 Cases ...." (**emphasis** added).

Plan § 7.2.2.

*Channeling Injunction*

19.    Section 5.8 of the Plan, titled **Channeling Injunction**, provides in relevant part:

- all Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan

and the Confirmation Order, except that Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction;

- upon the funding of the Sexual Misconduct Claims Fund by the Insurance Companies on behalf of the Released Parties … the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with the Sexual Misconduct Claims;

- **the Channeling Injunction shall be binding upon, and enforceable by its terms against, all Holders of Sexual Misconduct Claims, irrespective of whether any such Holder (i) has voted to accept the Plan or (ii) has agreed to be bound by the Channeling Injunction, in both cases, only because the Class consisting of the Holders of Sexual Misconduct Claims (Class 4) has voted to approve the Plan in accordance with section 1126(c) of the Bankruptcy Code.**

Plan at § 5.8 **(emphasis** added)**.**

### *The Plan's Deathtrap Provision*

20.     The Plan forces women to make a difficult financial and emotional choice: either agree to release Harvey Weinstein or forego 75% of their potential recovery from the Sexual Misconduct Claims Fund.

> Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the Liquidated Value of their Sexual Misconduct Claims in consideration of the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full Liquidated Value of their Sexual Misconduct Claims.

Plan at § 3.13.1.

### C.     The Confirmation Hearing

21.     A hearing on confirmation of the Plan was conducted on January 25, 2021 (the "Confirmation Hearing").  The Plan Proponents submitted certain declarations in support of

confirmation including the Declaration of Ivona Smith [D.I. 3185] ("Smith Decl."), a copy of which is attached hereto as **Exhibit A**. The following facts were adduced:

***The Debtors are Liquidating, not Reorganizing***

22.    Ms. Ivona Smith, director of the Debtors testified as follows:

Q:  The proposed plan before the Court is a plan of liquidation. True?
A:  It's a Chapter 11 plan of liquidation, yes.
Q:  And it's a plan of liquidation because the debtors are not currently operating and has no plans to operate in the future[?]
A:  That is correct.
Q:  And the plan is not filed to save anyone's job, right?
A:  That is correct.
Q:  The debtors have no current employees[?]
A:  Correct.
Q:  And the debtors are not generating any revenue from business operations[?]
A:  That is correct.

*See* January 25, 2021 Hearing Transcript ("Tr.") attached hereto as **Exhibit B**, at 42:13-43:1.

***The Court Could Not Make Specific Findings that Released Parties made Substantial Contributions to the Plan because the Plan Proponents Did Not Meet Their Burden***

23.    The Plan's definition of Released Parties[3] is overly broad and, on its face, most of the Released Parties are unidentified, and made *no* contribution to the Plan.  The definition of Released Parties also includes "(ii) professionals of firms specified in Schedule 1 to the Plan; and (iii) each such persons' or entities'. . . managers, employees . . . ."  Plan, Ex. 1, § 1.99.  A copy of

---

[3] "Released Parties" means: (i) the Debtors, the Estates, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, the Former Representatives and the Insurance Companies; (ii) professionals of firms specified in Schedule 1 to the Plan; and (iii) each such persons' or entities' current and former officers, directors and board representatives, predecessors, successors, assigns, insiders, subsidiaries, Affiliates, principals, equity holders, members, trustees, partners, managers, employees, agents, members of any boards or similar bodies of such persons, advisory board members, insurers, reinsurers, and such persons' respective heirs, executors, estates, and nominees, in each case as applicable and in their capacity as such, with respect to liability for the actions or inactions of the Former Representatives, the Debtors, the Estate, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies; provided, however, those persons or entities who fall within subparagraph (iii) (other than persons or entities specified in subparagraphs (i) and (ii)) are not released with respect to their own actions related to Sexual Misconduct Claims, regardless of their relationship with the Former Representatives, the Debtors, the Estates, NonDebtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies, to the extent such action constitutes aiding, abetting or conspiracy to prevent the disclosure of or to cover up any Sexual Misconduct Claim (each a "Non-Released Party"). Plan, Ex. 1, § 1.99.

Schedule 1 is attached hereto as **Exhibit C**.  The Plan Proponents provided no evidence that *any* of these parties made a substantial (or any) contribution to the Plan.  For example, the Plan Proponents provided no evidence that Lewis Brisbois, Harvey Weinstein's lawyers, or any other Former Representative's lawyers, made any contribution.  Ms. Smith testified they were just "representing their clients."  Tr. at 75:5-76:14.

24.     **The Plan Proponents Did Not Substantiate Releases for the Former Representatives.**  The Former Representatives are not making any affirmative contribution to the Plan. To the contrary, they are *receiving* a payment of about $9.7 million, which is approximately 28% percent of the entire Settlement Amount contributed by the Insurance Companies.  The purported contribution of the Former Representatives, instead, comes in the form of agreeing to take less than they claim that they are owed from the Insurance Companies for reimbursement of their legal costs from defending actions against them.  The Plan Proponents contend this is sufficient but did not present evidence sufficient for the Court to make specific findings.  The fact that the Former Representatives would not have approved the Plan without receiving a payment under the Plan, Tr. at 74:9-10, should be given no weight.  The Former Representatives, at best, had worthless unliquidated indemnity claims against the Debtors and were releasing the Insurance Companies for defense costs that the Insurance Companies never acknowledged they owed and were subject to challenge.

25.     The Plan Proponents assert that the Former Representatives made a substantial contributed to the Plan by agreeing to release fifty (50%) percent of the legal fees they incurred as of April 25, 2019.  Smith Decl. at ¶ 18(c).  The Former Representatives allegedly incurred approximately $20 million in legal fees.  Tr. at 71:19. However, it is far from clear the Former Representatives are entitled to the asserted amount.  The invoices totaling $20 million were not

submitted to the Court.  Ms. Smith testified at the Confirmation Hearing that she "do[es]n't even know if [the Former Representatives] submitted invoices," *id.* at 70:16, that "nobody has ever shown [her] an actual invoice," *id.* at 71:6, that she is "not aware if [the asserted fees]'ve been reviewed for reasonableness, *id.* at 71:9-10, that she has "not investigated the invoices behind the legal directors and their legal defenses," *id.* at 72:14-15, and that she "do[es]n't know any of the arrangements that any of the Former Representatives had with their attorneys in terms of what they're going to have to pay and what they don't," *id.* at 73:6-10.

26.    The Plan Proponents also did not put forth any evidence showing the Insurance Companies have acknowledged their duty to defend the lawsuits against the Former Representatives or have agreed to reimburse the alleged legal fees in the event the Plan was not confirmed.  It is possible that if the Plan was not confirmed the Insurance Companies would have contested that such fees are reimbursable or, even if reimbursable, the amounts asserted subject to substantial reduction.

27.    There is also no evidence about the *specific contributions* allegedly made by each Former Representative to justify the non-consensual releases they have received.  According to the Plan Proponents, the 13 Former Representatives[4] allegedly waived approximately an aggregate amount of $10 million in attorney's fees.  However, the Plan Proponents made no effort to specify the fees incurred by each individual Former Representative.  From the record, it is possible that several of the Former Representatives incurred *de minimis* or no fees, and they are being released from the claims of all Weinstein survivors without making more than a token contribution to the Plan.  When asked for an allocation of what each of the Former Representatives was contributing

---

[4] "Former Representatives" means Robert Weinstein, Tarak Ben Ammar, James Dolan, Frank Gil, David Glasser, Richard Koenigsberg, Marc Lasry, Lance Maerov, Jeff Sackman, Tim Sarnoff, Barbara Schneeweiss, Paul Tudor Jones, and Dirk Ziff.  Plan, Ex. 1, § 1.48

in waived fee reimbursement, Ms. Smith responded that she had no idea.  Tr. at 70:10-22. Likewise, the Debtor has introduced no evidence that any of the Former Representatives will actually be required to pay their lawyers for the attorneys' time for which they will not receive reimbursement.

28.     Most notably, the Plan Proponents failed to quantify the amount of legal fees purportedly waived by Robert Weinstein.  Tr. at 69:22-70:6, 70:23-71:1.  Indeed, there is no evidence in the record from which the Bankruptcy Court could have determined that Robert Weinstein made a substantial contribution to the Plan. *Id.* The Non-Consenting Sexual Misconduct Claimants dispute that Robert Weinstein has made a substantial contribution by merely giving up an unspecified amount of legal fees, especially because one of the pending lawsuits against him survived a motion to dismiss and he faces substantial potential liabilities if the Plan is not confirmed.

**D.     The Appeal**

29.     On February 9, 2021, the Non-Consenting Sexual Misconduct Claimants filed a notice of appeal [D.I. 3228] (the "Appeal") from the Confirmation Order.

**RELIEF REQUESTED**

30.     By this motion, and pursuant to Bankruptcy Rule 8007, the Non-Consenting Sexual Misconduct Claimants request entry of an order staying consummation of the Plan pending final resolution of the Appeal.

## BASIS FOR RELIEF

### A.    The Standards for Granting a Stay Pending Appeal

31.    Bankruptcy Rule 8007 provides that "a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal" or "the suspension or continuation of proceedings in a case."  Fed. R. Bankr. P. 8007(a)(1)(A).

32.    The Third Circuit has recognized that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position."  *In re Highway Truck Drivers & Helpers Local Union #107,* 888 F.2d 293, 298 (3d Cir. 1989).   In evaluating the appropriateness of a stay pending appeal, the following factors come into play:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

33.    The "most critical factors" are "the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm."  *Id.* at 568 (quotation marks omitted).  However, "the former is arguably the more important piece of the stay analysis."  *Id.*

34.    Because *each* of the four factors weighs in favor of staying the Confirmation Order, this Court should grant the Non-Consenting Sexual Misconduct Claimants' request.

### B.    The Non-Consenting Sexual Misconduct Claimants are Likely to Succeed on the Merits of Their Appeal

35.    A stay applicant in the Third Circuit will demonstrate "a sufficient degree of success for a strong showing" where "there is 'a reasonable chance, or probability, of winning.'"  *In re*

*Revel*, 802 F.3d at 568-69 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)).  "[T]he likelihood of winning on appeal need not be 'more likely than not.'"  *Id.* at 569.

36.     The Non-Consenting Sexual Misconduct Claimants are likely to succeed on the merits of their appeal.  The Bankruptcy Court forced rape and sexual assault victims to release the Debtors' former board members from all accountability and liability with respect to Harvey Weinstein's sexual misconduct.  The releases are not consensual, not fair, and certainly are not necessary to any reorganization: the Debtors have been out of business for years.  The Plan's third party non-consensual releases do not meet "the hallmarks of permissible non-consensual releases … fairness, necessity to the reorganization, and specific factual findings to support these conclusions."  *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000).  Moreover, the Debtors did not remotely meet the "exacting standards" required "if such releases and injunctions are to be permitted."  *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 139 (3d Cir. 2019). In particular, there are no "exceptional facts" warranting the extraordinary relief provided in the Plan. *Id.* at 129.

**The Third Party Non-Consensual Releases are Not Necessary to the Debtors' Reorganization**

37.     In *Continental*, the Third Circuit considered a provision in Continental's confirmed plan that "released and permanently enjoined shareholder lawsuits against certain of Continental Airline's present and former directors and officers who were not themselves in bankruptcy." *Continental,* 203 F.3d at 205.  The Third Circuit noted that several circuit courts of appeal have flatly rejected that relief incorporated into a plan because it is "indistinguishable from a bankruptcy

discharge" and because of the express provisions of §524(e).[5]  *Id.* at 212 (internal citations omitted).

38.     In considering the issue, the Third Circuit considered how other circuits had dealt with the issue.  The Third Circuit considered such noteworthy reorganizations as *Drexel*, *Manville* and *Robins*.  *See Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir.1992) ("*Drexel*"); *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 702 (4th Cir.1989) ("*Robins*"); *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 640, 649 (2d Cir.1988) ("*Manville*").  The Third Circuit noted that "[a] central focus of these reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties."  *Continental,* 203 F.3d at 212.

39.     The Third Party Non-Consensual Releases are *not* necessary to the reorganization because *there is no reorganization in these cases.*  This is not a mass tort case with non-debtors' businesses in the supply chain being sued thereby jeopardizing the reorganization of the debtor's business.  The Plan is not preserving and protecting the Debtors enterprise value or saving any jobs.  The Debtors simply are liquidating, which they could easily accomplish in chapter 7.[6]  The Third Circuit has not approved Third Party Non-Consensual Releases in the context of a liquidating debtor. Indeed, even in the context of an actual reorganization, the Third Circuit has acknowledged the danger of courts approving non-consensual third-party releases "simply because reorganization financers demand them."  *In re Millennium*, 945 F.3d at 139.

---

[5] Section 524(e) provides in relevant part:  "[the] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."
[6] On May 14, 2019, the Debtors themselves filed a *Motion for an Order (I) Converting Their Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code and (II) Granting Related Relief* [D.I. 2357].

40.     The Court should not relegate the Third Circuit's "necessary to the reorganization" standard with simply funding the amount necessary to confirm *any* plan of liquidation.  The analysis should not simply be: are holders of Sexual Misconduct Claims faring better under the Plan than chapter 7?  The analysis should include admissible evidence whether they are faring better under the Plan or the tort system and, in any event, if a holder chooses to return to the tort system, there should be an opt-out provision from the Plan.  The Plan should not "trap" tort victims who are involuntary creditors of the Debtors; *i.e.,* they did not choose to do business with the Debtors.

41.     If the "necessity to reorganization" test is reduced to just the amount of money necessary to return one cent more to creditors under a plan than they would receive in chapter 7, the Court needs only a calculator and does not need to make the *specific findings* as required by the Third Circuit.  Such a rule, if adopted, would also mean that Third Party Non-Consensual Releases are for sale to insurance companies in Delaware chapter 11 cases; *i.e.,* for a debtor with substantial tort liability, the insurance company only needs to fund a plan.  If their internal analysis shows they have more exposure than the cost of funding, a restructuring agreement will be put forward to fund a plan conditioned on granting extraordinary relief to the insurance company.

42.     To provide guidance, and avoid cases that involve solely the adjustment of the insurance company-beneficiary relationship as opposed to the debtor-creditor relationship, the Court should make clear when Third Party Non-Consensual Releases are necessary to a reorganization and distinguish when they are not necessary, *e.g.,* plans of liquidation.  Third Party Non-Consensual Releases should only be available to a debtor that is truly reorganizing and entitled to a discharge.  These releases should only be made available to aid the debtor's discharge and reorganization.  Otherwise, as is the case here, third parties are receiving more robust relief

from the Court than the Debtors are entitled to receive.  And if such releases are used in a liquidating chapter 11, the debtor should be required to provide evidence that tort claimants are faring better under the plan than in the tort system and provide an opt out to the tort system if the claimant is not satisfied by her treatment under the plan.

43.     The Plan Proponents, in opposing a stay pending appeal in the bankruptcy court, asserted that the Non-Consenting Sexual Misconduct Claimant have no more than a "negligible" chance to prevail on appeal in the absence of a Third Circuit decision expressly holding that Third Party Non-Consensual releases are unavailable in the context of a plan of liquidation. Dkt. No. 3240. But the Plan Proponents ignore that nonconsensual releases of non-debtors are considered "extraordinary" relief.  *In re Firstenergy Sols. Corp.*, 606 B.R. 720, 738 (Bankr. N.D. Ohio 2019); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 726 (Bankr. S.D.N.Y. 2019). Indeed, in some circuits, such releases are *per se* impermissible, even in an actual restructuring, except where specific authorized by the Bankruptcy Code.  *Resorts Int'l, Inc. v. Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *Landsing Diversified Props.-II v. First Nat'l Bank and Trust Co. of Tulsa*, 922 F.2d 592, 600–02 (10th Cir. 1990) (concluding "[o]bviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders").  The lack of an appellate case approving of nonconsensual releases of a non-debtor in a plan of liquidation underscores the unprecedented nature of the Plan confirmed by the bankruptcy court, and that the Plan is highly unlikely to survive appellate review.[7]

---

[7]  Indeed, in the Bankruptcy Court, the Debtors only cited a handful of lower court cases purporting to approve nonconsensual third-party releases for a debtor that was ceasing operations.  But those decisions are distinguishable for the reasons discussed below. *See infra* at ¶¶ 49-52.

**The Former D&Os Indemnification Claims in these Cases Have no Value and the Release of those Claims by the Former D&Os is Not a Substantial Contribution to the Plan.**

44.     Even if nonconsensual third-party releases could ever be warranted in a plan of liquidation, the record does not demonstrate that the Former Representatives made substantial contributions to the Plan, as is required.  *See Continental*, 203 F.3d at 215.  In *Continental*, the Third Circuit considered but dismissed certain of the District Court's findings concerning D&O indemnification claims in that appeal.  The District Court found that "the release and permanent injunction of Plaintiffs' claims to be a 'key element' of Continental Debtors' Reorganization because the Continental Debtors were obligated to indemnify the D&Os and thus would ultimately bear the burden of Plaintiffs' lawsuits."  *Id*. at 215 (internal citations omitted).  The Third Circuit, however, found "no evidence in the record before us supporting the possibility or probability of D&O indemnification as a factual or legal matter.  Even if the D&O defendants' obligations culminating from Plaintiffs' class actions were indemnifiable, the fact that the reorganized Continental Airlines might face an indemnity claim sometime in the future, in some unspecified amount, does not make the release and permanent injunction of Plaintiffs' claims 'necessary' to ensure the success of the Continental Debtors' reorganization."  *Id*. at 216.

45.     That reasoning applies and is even more compelling in these cases.  Here, the Debtors are liquidating.  The D&O indemnity claims—that the Former Representatives are releasing under the Plan—are virtually worthless.  At best, they are general unsecured claims against the Debtors that are receiving a 1.46% distribution under the Plan.  *See* Liquidation Analysis, attached as Ex. B to the *Fourth Amended Disclosure Statement in Support of the Fourt Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* [D.I. 3098].  Further, the Plan Proponents never demonstrated that such theoretical indemnity claims: (a) fall within the purview of the Debtors' actual indemnity

{00030167. }                                          20

provisions, (b) that the Debtors' applicable indemnity provision will remain extant at the time

claims for indemnity are asserted; and (c) all Former Representatives timely filed proofs of claim.[8]

Finally, the Third Circuit noted "[t]he Continental Debtors elected to retain their contractual

obligations under bylaws and 'assumed' employment contracts." *Id*. at fn. 15.  In these cases, the

Plan is silent on whether the corporate document and/or employment contracts containing the

indemnity agreements are assumed.  Accordingly, such agreements are deemed to have rejected

by the Plan.[9]

**The Claims the Former Representatives Have for Reimbursement of Defense Costs is Disputed and the Plan Proponents Did Not Demonstrate the Release of those claims is a Significant Contribution to the Debtors' Plan.**

46.     The Third Circuit in *Continental* also considered that "Plaintiffs' actions against the

non-debtor D&O defendants implicated the Continental Debtors' D&O liability insurance policy,

and thus affected property of the Continental Debtors' bankruptcy estate." *Id*.  The Third Circuit

noted:

> We do not dispute that, some day in the future, the reorganized
> Continental Debtors may face litigation or experience some
> financial ramification based on the liabilities of the Ds&Os as a
> result of the indemnity obligation or the D&O liability insurance
> policy.  However, we cannot accept the District Court's conclusion
> that a purported 'identity of interest' between the Continental
> Debtors and the non-debtor D&O defendant, forged by the

---

[8] The failure to file a proof of claim results in the bar to any recovery from the bankruptcy estate.  *See* Order (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing Deadlines for Filing Requests for Payment of Postpetition Administrative Expenses, (III) Approving Form and Manner of Notice Thereof, and (IV) Granting Related Relief [D.I. 1890] at ¶ 10.  ("Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a proof of claim or an Administrative Claim on or before the applicable Bar Date as provided herein, but fails to do so: . . . (ii) **forever shall be barred, estopped, and enjoined from asserting such claim** against each of the Debtors and their property (or filing a proof of claim or an Administrative Claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim.") (**emphasis** added)

[9] Plan at § 8.1 ("Except as otherwise provided for herein, and except for executory contracts and unexpired leases which the Debtors either have assumed, have rejected or have filed a motion to assume or reject prior to the Confirmation Date and which remains pending as of the Confirmation Date, all executory contracts and unexpired leases for goods, services, or premises used in connection with Debtors' business operations **shall be deemed rejected** by the Debtors on the Effective Date, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases.") (**emphasis** added).

> indemnity obligations or the D&O liability insurance policy, established by the necessity of releasing and permanently enjoining Plaintiffs' claims, nor does this identity of interest speak to the fairness of the release and permanent injunction that we construe cases like Manville, Drexel or Robins to require. We conclude that granting permanent injunctions to protect non-debtor parties on the basis of theoretical identity of interest alone would turn bankruptcy principles on their head. Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.

*Id*. at *217.

47.     The Debtors' cases bear no resemblance to the mass tort cases referred to by the Third Circuit with thousands of tort claims and an on-going business to protect. Here, there are only 55 potential holders of class 4 Sexual Misconduct Claims and many of those claims may be stale by reason of the statute of limitations or for other reasons. The Plan Proponents failed to show an identity of interest between the Third Party Releasees and the Debtors sufficient to make specific findings. For example, the Professional Firms attached as Schedule 1to the Plan made no contribution to the Plan and merely did their jobs.

48.     The Third Circuit ultimately found "the release and permanent injunction amounted to nothing more than a lockstep discharge of non-debtor liability and fall squarely into the section 524(e) prohibition." *Id*. at * 217.

**The *Blitz* Case is Distinguishable**

49.     The Plan Proponents' erroneously rely on *In re Blitz U.S.A., Inc., et al.*, 2014 WL 2582976 (Bankr. D. Del. 2014) ("*Blitz*") to justify the third party nonconsensual releases in the Plan. *Blitz* is distinguishable in several ways. <u>First</u>, the contribution by Insurance Companies was substantial and tangible; certain Participating Insurers were actually buying back their policies for over $137 million. *Id*. at 4. Here, the Insurance Companies are not buying back or assigning their policies; they are contributing only a small fraction of the towers of available proceeds. In *Blitz*,

expert testimony was presented to the court as to the value of "pending Covered Blitz Personal Injury Claims in the tort system" and the amount funded into the "Blitz Personal Injury Trust" exceeded that sum by approximately $61 million. *Id*. Here, no expert testimony was presented and, as noted, the amount funded by the Insurance Companies is far less than the towers of insurance otherwise available. Further, there was expert testimony that holders of Covered Blitz Personal Injury Claims fared better than projected recoveries in the tort system. The Plan Proponents made no such showing by way of expert testimony. The *Blitz* opinion also does not appear to be rendered to resolve an adjudicated matter. It consists only of the Court's Findings of Fact and Conclusions of Law concerning the confirmed plan of liquidation in *Blitz*.

50.     Second, in *Blitz*, the court found "[t]here is a substantial identity of interest between the Debtors and the Protected Parties, such that a Blitz Personal Injury Claim asserted against a Protected Party is essentially a claim against the Debtors." *Id*. That is not true in these cases. A claim against Robert Weinstein by the Non-Consenting Sexual Misconduct Claimants is not the same. Robert Weinstein, in turn, may have two resulting claims: a worthless claim for indemnification, and a claim for reimbursement of defense that the Insurance Companies may challenge legally and factually. The Court made no specific findings as to the identity of interest between Robert Weinstein and the Debtors.

51.     The plan in *Blitz* also "provides holders of Blitz Personal Injury Claims with the opportunity to reject the settlement offers they receive from the Blitz Personal Injury Trust and resort to the tort system to liquidate their claims." *Id*. at *19. The Plan here does not provide the same opt-out.

52.     The Plan Proponents' reliance on *In re United Steel Enterprises, Inc.*, No. 03-50284 (NLW), 2009 WL 1025398 (Bankr. D.N.J. Jan. 15, 2009 ("*United Steel*") similarly is misplaced.

*United Steel* does not involve tort claimants.  Also, the plan was approved on an uncontested basis.  Likewise, in *In re: Residential Capital, LLC*, No. 12-12020 (MG), 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013), cited by the Plan Proponents in opposing a stay pending appeal, the third-party releases were not opposed by creditor who would have been affected by them. *Id.* at *14.

53.     The Plan is also fundamentally flawed that it seeks to bind future claimants[10] to the terms of the Plan when such future claimants are not represented at the Confirmation hearing.

54.     Even if non-consensual third party releases are appropriate in the context of a liquidation, the Debtors failed to prove that tort claimants fared better than they would under the tort system as they did in *Blitz* and there was an opt out to return to the tort system.  While the Debtors contend that the settlement with its insurers would collapse in the absence of the complete non-consensual releases of the Former Representatives, there were only eight Class 4 members who voted against the Plan.  Given the limited number of possible opt-outs, the Debtors' contention that the non-consensual releases are indispensable to the Plan is implausible.  Indeed, Ms. Smith would not predict that the settlement would dissolve if the bankruptcy court declined to confirm the Plan as presently drafted.  Tr. at 57:8-14.

**The Third Party Non-Consensual Releases are Not Fair**

55.     The Third Party Non-Consensual Releases are not fair because the Non-Consenting Sexual Misconduct Claimants do not agree to release the defendants they named in their lawsuits

---

[10] The Plan's definition of "Claim" includes "future claims[.]" Plan, Ex. 1, § 1.22. This expands the definition of "Claim" in section 101(5) of the Bankruptcy Code and parallels section 524-relief.  *See also* Plan at § 5.8.1 ("[P]ursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons and Entities that (a) have held or asserted, or that hold or assert, or that ***may hold or assert in the future, any Sexual Misconduct Claims*** against the Released Parties, . . . each shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Released Party or Harvey Weinstein with respect to any Sexual Misconduct Claims . . . .") (***emphasis*** added).

and wish to continue their path to justice that, significantly, in these cases includes non-monetary considerations. A release is consensual and should never be imposed as a matter of law on a rape/sexual assault victim.[11] The Plan is governed by the law of the State of Delaware, Plan at § 14.6, and the Plan Proponents point to no Delaware law that authorizes a non-consensual release. A release or waiver is contractual in nature and requires that it be knowing, voluntary and for consideration. There is nothing fair in finding the Non-Consenting Sexual Misconduct Claimants "release" and "waive" their claims against the Released Parties when, in fact, they do not.

56.     The calculation of votes for the purpose of determining acceptance by Class 4 holder of Sexual Misconduct Claims was not fair. The Bankruptcy Code expressly provides that creditors with a larger claim at stake are given a larger voice in voting on a plan. Section 1126(c) provides that a plan may only be confirmed by 2/3 in dollar amount and one-half in number in each class voting to approve the plan. Here, the claims of rape and sexual assault victims were discounted to $1, reduced to the same voting power as claimants who were victims of verbal sexual harassment and potentially holders of claims whose claims are barred by a statute of limitations. That voting scheme deprived rape and sexual assault victims who have timely filed claims the greater voice they are entitled to under section 1126(c). The Plan effectively disenfranchised the Non-Consenting Sexual Misconduct Claimants.

57.     The Plan was not fair because it did not permit women to opt-out of treatment under the Sexual Misconduct Claims Fund and return to the tort system. Although the Plan allows women not to release Harvey Weinstein *only* – there is no opt-out for any other person or entity – he is most likely judgment proof, and this limited "opt-out" is illusory. The Plan severely penalizes women who refuse to release Harvey Weinstein by forcing them to forego 75% of their recovery

---

[11] Tort victims are not *voluntary* creditors of the Debtors. Here, because of Harvey Weinstein's egregious conduct, the tort victims are seeking recourse against, *inter alios*, alleged third party tortfeasors.

under the Plan.  Surcharging women in this way for pursuing Harvey Weinstein is re-victimization.
The economic penalty associated with releasing Harvey Weinstein will undoubtedly have the
unfortunate consequence of encouraging women to release Harvey Weinstein.  In exchange for
this enormous benefit, Harvey Weinstein's "contribution" to the Plan is that he is purportedly
forgoing reimbursement of certain legal costs he has incurred. However, as with all of the Former
Representatives, the record is devoid of any evidence showing what, if anything, Harvey Weinstein
will actually have to pay as a result of this "contribution."

58.     The Plan also is not fair because the Sexual Misconduct Claims Examiners—Jed
Melnick and Simone Lelchuk—were the mediators who unsuccessfully mediated the Non-
Consenting Sexual Misconduct Claims.  By accepting a decision-making role in a case in which
they previously served as mediators without the consent of the Non-Consenting Sexual
Misconduct Claimants, Mr. Melnick and Ms. Lelchuk have violated basic ethical standards
governing mediators. ABA Model Standards of Conduct for Mediators, Standard (VI)(A)(8) ( a
mediator "shall not undertake an additional dispute resolution role in the same matter without the
consent of the parties.").  Thus, in addition to stripping the Non-Consenting Sexual Misconduct
Claimants of their right to pursue their claims, the Plan provides that the value of their claims will
be assessed by biased, ethically compromised decision makers.  This is the antithesis of "fairness."

**The Debtors' Chapter 11 Cases are Merely Liquidating and are Not Exceptional**

59.     These cases are notorious because of disgraced Harvey Weinstein, and the Debtors'
board that allegedly looked the other way and failed to supervise his decade's long sexual
misconduct.  The victims and survivors of Harvey Weinstein are exceptional and courageous
because they came forward to hold Harvey Weinstein and the board accountable and liable, and,
in so doing, improve the work environment for women around the world.  There is nothing

exceptional about insurance companies paying less to fund a plan of reorganization than would cost them if they were forced to litigate further in the tort system.  And that is exactly what these cases are about.  Insurance companies are very adept at assessing risk and cost-benefit analyses. If the insurance companies faced less risk and cost outside bankruptcy, these cases would be in liquidating in chapter 7, not chapter 11.

60.     There is nothing exceptional about a moribund chapter 11 case that lacks sufficient cash to pay its expenses of administration.  There are no secured claims against the Debtors' assets. Tr. at p. 11, 20-21.  The Debtors here benefited from the fact they had potential tort exposure and towers of insurance.  That presented the opportunity for the Debtors to "sell" to the insurance companies the vast protections of the Bankruptcy Code, even beyond what the Debtors themselves were entitled to.  The Debtors were administratively insolvent, had no options other than chapter 7 and therefore had little bargaining power with the Insurance Companies.

61.     The Insurance Companies agreed to fund a *de minimis* recovery to general unsecured creditors and a meager Sexual Misconduct Fund on the condition that the Plan provides the most robust relief this Court can provide: Third Party Releases and a Channeling Injunction. The Third Circuit test for "necessary to a reorganization" should not be the lowest hurdle; *e.g.,* administrative solvency and a penny to unsecured creditors.  The court does not need to make specific findings if the Third Circuit's hallmark is set that low.

62.     Based on the forgoing reasons, the Non-Consenting Sexual Misconduct Claimants have sufficiently established the likelihood that they will prevail on the merits of the Appeal for purposes of this Motion.

**C.     The Non-Consenting Sexual Misconduct Claimants Will Be Irreparably Harmed if a Stay Is Not Granted**

63.     A stay applicant must also show that "irreparable injury is *likely* . . . in the absence of a stay." *In re Revel*, 802 F.3d at 569 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)) (brackets omitted).  The Third Circuit has explained that "for irreparable harm we understand the Supreme Court's use of 'likely' to mean more apt to occur than not." *Id.*  A "purely economic injury, compensable in money," constitutes an "irreparable injury . . . where the potential economic loss is so great as to threaten the existence of the movant's business." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).

64.     Although the Non-Consenting Sexual Misconduct Claimants do not concede or believe that closing the Settlement embodied in the Plan will render their Appeal moot, the uncertainty of how the appellate courts in this circuit may apply the mootness principles places the Non-Consenting Sexual Misconduct Claimants at the risk of irreparable injury if a stay pending appeal is not granted, as they may be denied their right of substantive appellate review absent a stay.  Courts recognize where, like here, "the denial of a stay pending appeal *risks* mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers LLC),* 465 B.R. 18, 36 (D. Del. 2011) (finding risk of equitable mootness supported issuance of stay) (quoting *Williams v. Republic (In re Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007)) (emphasis added).  As the Third Circuit has stated, "[c]ertainly, the fact that the decision on the stay may be dispositive of the appeal in some cases is a factor that an appellate court must consider" in determining whether irreparable harm will result from the denial of a stay.  *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).  Absent a stay, the Non-Consenting Sexual Misconduct Claimants face an imminent danger of being bound by a forced settlement transaction

constructed with the plain intent to strip them of their rights to pursue litigation against the Former Representatives, without an opportunity to obtain an appellate court's review of the underlying decision and conclusions of law.

65.     If a stay pending appeal is not issued, the Non-Consenting Sexual Misconduct Claimants will also suffer irreparable harm because they will be indefinitely enjoined from pursuing their claims against all defendants other than Harvey Weinstein.  Thus, even if they prevail on appeal, this delay – potentially years – will make it difficult to secure the evidence and testimony that they need to prevail. Moreover, because of the requirements of the Plan, unless the Non-Consenting Sexual Misconduct Claimants are willing to forgo 75% of a potential award to pursue claims solely against Harvey Weinstein, they may be forced to dismiss their case entirely in the courts in which they are now pending. It is unclear how or if those cases could be restored if the Plan is overturned on appeal. Accordingly, a stay is essential for the Non-Consenting Sexual Misconduct Claimants to have a plausible path to succeeding on their claims.

**D.      A Stay Pending Appeal Will Not Injure Other Parties**

66.     Courts in the Third Circuit "weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)." *In re Revel*, 802 F.3d at 569. The Debtors ceased operations several years ago.  The sole remaining task is to distribute the Settlement Amount. The delay in the event the Settlement cannot close immediately will not materially harm the Debtors' estates or other parties. While the creditors who support the Plan, including other sexual misconduct victims of Harvey Weinstein, would presumably prefer to receive the proceeds of the Plan without any delay, the Plan Proponents cannot demonstrate that those creditors would be injured by maintaining the status quo while an appeal is adjudicated.

{00030167. }                                    29

**E.**     **Granting A Stay Is in the Public Interest**

67.     In evaluating the appropriateness of a stay, courts in the Third Circuit "take into account where the public interest lies (factor four)—in effect, how a stay decision has consequences beyond the immediate parties." *Id.* (quotation marks omitted).  Issuance of a stay in this case will not negatively impact any significant public interest.  The stay in fact is supported by the strong public policy in favor of correct application of the law.  *See Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990) (noting that "[t]he public interest lies in the correct application [of the law]").  A stay also preserves the ability to redress harm through appellate review.  *See Charles & Lillian Brown's Hotel*. 93 B.R. at 53 (recognizing the vital role stays pending appeal play in preserving parties' rights, including the "right to a review on the merits"); *see also AT&T Co. v. Winback & Conserve Program. Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff).  Although public policy favors the expedient administration of the bankruptcy proceedings, expediency here is trumped by the risk that, if the Non-Consenting Sexual Misconduct Claimants are correct, their right to pursue a jury trial against the Former Representatives are forever lost as a result of equitable mootness.  A short delay is justified in light of the risk of the Non-Consenting Sexual Misconduct Claimants' loss of their rights.

**F.**     **No Bond is Necessary**

68.     The Court has discretion to grant a stay pending appeal under Rule 8007 without requiring the posting of a supersedeas bond.  *See Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001); *Schwartz* v. *Covington,* 341 F.2d 537 (9th Cir. 1965); *In re Byrd,* 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994).  The exercise of such discretion is warranted here.

The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." *In re United Merchants & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992).  But where the adverse party will not suffer any losses as a result of a stay pending appeal, a bond is not necessary. *Id.*; *see also Zenith Elecs. Corp.*, 258 F.3d at 191 (noting that a stay may be sought "with or without posting a bond").

69.     Here, the entry of a stay so Non-Consenting Sexual Misconduct Claimants may pursue an appeal will not harm the Debtors in any way.  The Debtors are not operating and have no employees.  The posting of a bond is not warranted given these facts. Outrageously, the Plan Proponents asserted before the Bankruptcy Court that the Non-Consenting Sexual Misconduct Claimants should be required to post a bond of approximately $36 million as a condition of a stay. As the Plan Proponents are well aware, imposing such a requirement on four individual victims of rape and sexual misconduct is tantamount to denying the stay, even if all of the substantive requirements are otherwise satisfied. Moreover, contrary to the Plan Proponent's assertions, there is no basis to conclude that a delay in implementing the Plan will cause the Plan to fail, or that a stay will cause a monetary loss to anyone.

**WHEREFORE**, for the foregoing reasons, the Non-Consenting Sexual Misconduct Claimants respectfully request that this Court grant the relief requested and enter an order, a proposed form of which is attached hereto as **Exhibit D**, granting a stay pending appeal of the Confirmation Order.

*[Signature follows on next page]*

Dated: February 19, 2021
        Wilmington, Delaware

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE # 3995)
Zhao (Ruby) Liu (DE# 6436)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Tel.: (302) 777-1111
Email: rosner@teamrosner.com
       liu@teamrosner.com

-    and    -

**WIGDOR LLP**
Douglas H. Wigdor, Esquire.
Bryan L. Arbeit, Esquire
85 Fifth Ave, Fl. 5
New York, NY 10003
Phone: (212) 257-6800
Email: dwigdor@wigdorlaw.com
barbeit@wigdorlaw.com

-    and    -

**THE LAW OFFICE OF KEVIN MINTZER, P.C.**
Kevin Mintzer, Esquire
1350 Broadway, Suite 2220
New York, New York 10018
Phone: (646) 843-8180
Email: km@mintzerfirm.com

-    and    -

**RHEINGOLD GIUFFRA RUFFO & PLOTKIN LLP**
Thomas P. Giuffra, Esquire
551 5th Avenue, 29th Floor
New York, NY 10176
Phone: (212) 684-1880
Email: tgiuffra@rheingoldlaw.com

*Counsel for the Non-Consenting Sexual Misconduct Claimants*

{00030167. }