## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*, | Bankr. Case No. 18-10601 (MFW) |
| Debtors. | |
| WEDIL DAVID, DOMINQUE HUETT, ALEXANDRA CANOSA AND AIMEE MCBAIN, | Civ. Case No. 21-00171 (MN) |
| Appellants, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.* and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Appellees. | |

## OPENING BRIEF BY APPELLANTS IN SUPPORT OF
## APPEAL FROM CONFIRMATION ORDER

**THE ROSNER LAW GROUP LLC**
Frederick B. Rosner (DE Bar No. 3995)
Zhao (Ruby) Liu (DE Bar No. 6436)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone:  (302) 777-1111
Email: rosner@teamrosner.com
liu@teamrosner.com

**WIGDOR LLP**
Douglas H. Wigdor, Esquire.
Bryan L. Arbeit, Esquire
85 Fifth Ave, Fl. 5
New York, NY 10003
Phone: (212) 257-6800
Email: dwigdor@wigdorlaw.com
barbeit@wigdorlaw.com

**THE LAW OFFICE OF KEVIN MINTZER, P.C.**
Kevin Mintzer, Esquire
1350 Broadway, Suite 2220
New York, New York 10018
Phone: (646) 843-8180
Email: km@mintzerfirm.com

**RHEINGOLD GIUFFRA RUFFO & PLOTKIN LLP**
Thomas P. Giuffra, Esquire
551 5th Avenue, 29th Floor
New York, NY 10176
Phone: (212) 684-1880
Email: tgiuffra@rheingoldlaw.com

Dated: April 12, 2021

*Counsel for Appellants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................... ii

PRELIMINARY STATEMENT............................................................................................1

STATEMENT OF JURISDICTION AND STANDARD OF REVIEW .........................................3

STATEMENT OF ISSUES ....................................................................................................4

STATEMENT OF THE CASE................................................................................................5

     I.       The Non-Consenting Sexual Misconduct Claimants ...............................................5

     II.     The Confirmed Plan ..............................................................................................8

     III.    The Confirmation Hearing....................................................................................11

     IV.    The Appeal .........................................................................................................15

SUMMARY OF THE ARGUMENT .......................................................................................16

ARGUMENT .....................................................................................................................17

     I.       The Bankruptcy Court erred in approving the Third Party Non-Consensual
             Releases...............................................................................................................17

             A.      The Debtors are Liquidating, Not Reorganizing........................................19

             B.      The Hallmark "Necessary to the Reorganization" Should Have
                    Meaning Beyond the Already Existing Confirmation Criteria. ................22

             C.      The Forced Releases are Not Fair. ...........................................................24

              D.      The Debtors' Chapter 11 Cases are Notorious, Not Exceptional...............26

     II.     The *Master Mortgage Factors* are Not Met ........................................................28

             A.      Bankruptcy Court erred in finding that all of the Former
                    Representatives of the Debtors and other Released Parties made a
                    "substantial contribution" to the Plan. .....................................................28

     III.    The Bankruptcy Court erred in finding that Section 105 standing alone is
             sufficient judicial authority to invoke the Channeling Injunction set forth
             in Section 5.8 of the Plan ....................................................................................33

CONCLUSION...................................................................................................................36

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Barbieri v. RAJ Acq. Corp.  (In re Barbieri)*,
    199 F.3d 616 (2d Cir. 1999) ................................................................. 34

*David v. Weinstein Co.*,
    431 F. Supp. 3d 290 (S.D.N.Y. 2019) ..................................................... 5

*David v. Weinstein Co.*,
    2019 WL 1864073 (S.D.N.Y. Apr. 24, 2019) ........................................... 5

*Drexel Burnham Lambert Grp. v. Drexel Burnham Lambert Grp.  (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992) ................................................................. 19

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000) ........................................................ *passim*

*Haskell v. Goldman, Sachs & Co.  (In re Genesis Health Ventures, Inc.)*,
    340 B.R. 729 (D. Del. 2006) .................................................................. 4

*Huett v. Weinstein Co., 2:18 CV 06012*,
    2019 WL 2902494 (C.D. Cal. Feb. 28, 2019) .......................................... 6

*Huett v. Weinstein Co.*,
    2018 WL 6314159 (C.D. Cal. Nov. 5, 2018) ........................................... 6

*In re Aegean Marine Petrol. Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) .................................................. 20

*In re Blitz U.S.A., Inc.*,
    2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ................................. 21

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ........................................................... 34, 35

*In re FirstEnergy Sols. Corp.*,
    606 B.R. 720 (Bankr. N.D. Ohio 2019) ................................................. 20

*In re KI-1, Inc.*,
    2006 WL 2801873 (Bankr. D. Del. Sept. 28, 2006) ............................... 34

ii

*In re Master Mortgage Inv. Fund*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ........................................................................ 2

*In re Millennium Lab Holdings II, L.L.C.*,
  945 F.3d 126 (3d Cir. 2019) .............................................................................. 18, 20

*In re Morristown & E.R. Co.*,
  885 F.2d 98 (3d Cir. 1989) ........................................................................................ 34

*In re United Steel Enters.*,
  2009 WL 1025398 (Bankr. D.N.J. Jan. 15, 2009) ........................................... 21, 22

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................... 2, 4

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) ..................................................................................... 19

*Law v. Siegel*,
  571 U.S. 415 (2014) .................................................................................................. 33

*Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Env't Energy, Inc.*),
  188 F.3d 116 (3d Cir. 1999) ....................................................................................... 3

*Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*),
  880 F.2d 694 (4th Cir. 1989) .................................................................................... 19

*Norwest Bank Worthington v. Ahlers*,
  485 U.S. 197 (1988) .................................................................................................. 33

*Opt-Out Lenders v. Millennium Lab Holdings II, L.L.C.* (*In re Millennium Lab Holdings II, L.L.C.*),
  242 F. Supp. 3d 322 (D. Del. Mar. 20, 2017) ......................................................... 34

*Rehal v. Weinstein*,
  2019 WL 2088435 (N.Y. Sup Ct, New York County May 13, 2019) ....................... 6

*United States v. Pepperman*,
  976 F.2d 123 (3d Cir. 1992) ..................................................................................... 34

**Statutes**

11 U.S.C. § 105 ......................................................................................... *passim*
11 U.S.C. § 524 ................................................................................ 19, 33, 35
11 U.S.C. § 1126 ....................................................................................... *passim*

11 U.S.C. § 1129 ................................................................................................ 22

11 U.S.C. § 1141 ............................................................................................ 3, 21

18 U.S.C. § 1591 ............................................................................................ 5, 6

28 U.S.C. § 158 .................................................................................................. 3

28 U.S.C. § 1291 ................................................................................................ 5

Cal. Civ. Code § 52.4 (Deering) ....................................................................... 5

Cal. Civ. Code § 1708.5 (Deering) ................................................................... 5

Appellants Wedil David, Dominique Huett, Alexandra Canosa and Aimee McBain (collectively, the "Non-Consenting Sexual Misconduct Claimants" or "Appellants"), by and through their undersigned counsel, respectfully submit this Opening Brief in Support of Appellants' appeal from the *Order Confirming* (the "Confirmation Order") (A2366)[1] *Plan Proponents' Fifth Amended Joint Chapter 11 Plan of Liquidation* (the "Plan")[2] (A0548) entered on January 26, 2021 by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Hon. Mary F. Walrath.

## PRELIMINARY STATEMENT

Appellants are women who are victims and survivors of Harvey Weinstein. They allege they were raped, sexually assaulted or sexually harassed by Harvey Weinstein. They are pursuing various litigations against Weinstein, his companies, and ultra-affluent co-Board members for allegedly looking the other way while Harvey Weinstein carried on decades-long sexual misconduct. Continuing to prosecute their direct claims against non-Debtor Board members such as Robert Weinstein is critical to their path to justice and re-taking control over their lives.

The Bankruptcy Court erred in approving a Plan that contained Third Party Non-Consensual Releases. The Plan and evidentiary record at the Plan confirmation hearing fell far short of satisfying the hallmarks for non-consensual releases set forth in *Continental*[3] and the

---

[1] All exhibits are contained in an Appendix filed separately herewith. Citations to the Appendix throughout this brief shall take the form (A___).

[2] Unless defined herein, capitalized terms shall have the meanings ascribed to them in the Plan.

[3] *See Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203 (3d Cir. 2000) ("*Continental*")("[t]he hallmarks of permissible non-consensual releases [are] **fairness**, **necessity to the reorganization**, and **specific factual findings to support these conclusions**." *Id.* at 214 (emphasis added).

*Master Mortgage Factors.*[4]  The Plan should not have been confirmed by the Bankruptcy Court because it, among other things:

- Unfairly and inappropriately insulates Former Representatives, as part of a larger group of Released Parties; *i.e.,* an overly broad group of largely undefined non-debtor parties, from all accountability and liability by granting them Third Party Non-Consensual Releases.   The Third Party Non-Consensual Releases are *de facto* discharges improperly granted in a liquidation case where the Debtor itself is not entitled to a discharge as a matter of law.

- Failed to make the specific findings required by *Continental* that: (i) the releases are necessary to the liquidation of the Debtors; (ii) the releases are fair; (iii) *each* of the Released Parties made a substantial contribution to the Plan to justify such relief and (iv) *each* of the Released Parties shared an identity of interest with the Debtors such that a claim against a Released Party is the same as a claim against the Debtors and depleted the Debtors' estate.   The evidence either was entirely lacking or to the contrary.

- Relies on section 105 of the Bankruptcy Code alone to invoke a Channeling Injunction forcing Appellants to release Robert Weinstein, among other Former Representative, and seek compensation solely from an inadequate Sexual Misconduct Claims Fund.

---

[4] *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing to *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)) (the factors to consider in connection with non-consensual releases include: (a) whether "an identity of interest between the debtor and the third party [exists], such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate" and (b) whether the released non-debtors made "substantial contribution . . . of assets to the reorganization") (the "*Master Mortgage Factors*").

In sharp contrast to the findings (or lack of findings) made by the Bankruptcy Court, the releases granted were not necessary to liquidate the Debtors' assets. The anomalous result is the non-debtor Released Parties received far greater bankruptcy protection; *i.e.*, a *de facto* discharge, than the defunct Debtor is entitled to receive as a matter of law. *See* 11 U.S.C. § 1141(d)(3). The Insurance Companies and Former Representatives simply bought discharges in a liquidating chapter 11 case. The *Continental* hallmark "necessary to the reorganization" should mean more than just the amount necessary to make the Plan feasible and provide a return greater than the chapter 7 alternative. The releases granted are not fair because voting on the Plan was not conducted in accordance with 11 U.S.C. § 1126(c). Appellants effectively were disenfranchised because the Bankruptcy Court deemed rape and sexual assault victims nominal creditors with a vote valued at $1. The vast majority of Released Parties made *no* contribution whatsoever to, and did not share an identity of interest with, the Debtors. Finally, standing alone, section 105 is not a magic Bankruptcy Code section that permits the Debtor to take *any* action, such as imposing a Channeling Injunction on Appellants' direct tort claims against Robert Weinstein. The Bankruptcy Court erred factually and as a matter of law in in granting such unfettered relief; *i.e.,* not permitting tort claimants to opt out and return to the tort system.

## STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1) over the Plan and related Confirmation Order. In exercising its appellate review, this Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 188 F.3d 116, 122 (3d Cir. 1999). In the case of mixed question of law and fact, this Court "exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its

application of those precepts to the historical facts." *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 34*0 B.R. 729, 732 (D. Del. 2006) (citation omitted).

## STATEMENT OF ISSUES

1.      Whether the Bankruptcy Court erred in approving the non-consensual third party releases set forth in Section 7.2 of the *Fifth Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") because the Plan is a plan of liquidation, not a true reorganization, and there are no jobs to preserve and no ongoing business to protect?

2.      Whether the Bankruptcy Court erred in approving the non-consensual third party releases set forth in Section 7.2 of the *Fifth Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") because the Bankruptcy Court failed to make specific findings to support its conclusion that the non-consensual third party releases were necessary to the reorganization or fair as required by *Gillman*, 203 F.3d 203?

3.      Whether the Bankruptcy Court erred in approving the non-consensual third party releases set forth in Section 7.2 of the *Fifth Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") because the Plan Proponents failed to satisfy the test set forth in *In re Zenith Elecs. Corp*, 241 B.R. 92 (Bankr. D. Del. 1999) ("*Zenith*") in order for each of the Released Parties to receive non-consensual third party releases?

4.      Whether the Bankruptcy Court erred in finding that all of the Former Representatives of the Debtors and other Released Parties made a "substantial contribution" to the Plan and have an "identity of interest" with the Debtors as required by *Zenith* when they made no affirmative contribution to fund the Plan and, at most, waived (a) potentially worthless claims for indemnity and (b) reimbursement of defense costs that are subject to dispute?

5.      Whether the Bankruptcy Court erred in finding that Section 105 standing alone is

sufficient judicial authority to invoke the Channeling Injunction set forth in Section 5.8 of the Plan?

## STATEMENT OF THE CASE

### I.     The Non-Consenting Sexual Misconduct Claimants

#### A.  Wedil David

Wedil David, an actress, was raped by Harvey Weinstein in California in 2016, and is the plaintiff in *David v. The Weinstein Company LLC et al*, No., 18 Civ. 5414, pending in the United States District Court for the Southern District of New York.  Ms. David has asserted claims of assault, battery, sexual battery under Cal. Civ. Code § 1708.5, gender violence under Cal. Civ. Code § 52.4, sex trafficking 18 U.S.C. § 1591, negligence and negligent supervision against Harvey Weinstein, The Weinstein Company LLC and The Weinstein Company Holdings LLC. Ms. David previously had asserted claims of negligence and negligent supervision against the following former directors and officers of the Debtors: Robert Weinstein, Lance Maerov, Richard Koenigsberg, Tarak Ben Ammar, Dirk Ziff, Tim Sarnoff, Paul Tudor Jones, Jeff Sackman, and James Dolan.  The district court dismissed Ms. David's claims against the Former Representatives by decisions dated April 24, 2019 and December 19, 2019.  *See David v. Weinstein Co. LLC*, No. 18-CV-5414 (RA), 2019 WL 1864073, at *1 (S.D.N.Y. Apr. 24, 2019); *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290 (S.D.N.Y. 2019).  Ms. David voluntary dismissed her remaining claims without prejudice on April 2, 2021, but retains the right to reinstate those claims in the event that this appeal is successful.  Ms. David also has the right to appeal the dismissal of her claims against the former representatives, and intends to do so, when there is a final decision in her case within the meaning of 28 U.S.C. § 1291.  However, under the Plan as confirmed, no longer has that option.

### B.  Dominique Huett

Dominique Huett, an actress and model, was sexually assaulted by Harvey Weinstein in California in 2010.  Ms. Huett is the plaintiff in *Huett v. The Weinstein Company et al.*, No. 2:18-cv-6012, pending in the United States District Court for the Central District of California.  Ms. Huett has asserted claims for negligence and sex trafficking 18 U.S.C. § 159118 against Harvey Weinstein and The Weinstein Company LLC.  The district court denied Harvey Weinstein's motion to dismiss Ms. Huett's claims.  *See Huett v. Weinstein Co. LLC*, No. 2:18 CV 06012, 2018 WL 6314159, at (C.D. Cal. Nov. 5, 2018).  Ms. Huett's case has been stayed by the district court pending the disposition of criminal proceedings against Harvey Weinstein.  *See Huett v. Weinstein Co. LLC*, 2:18 CV 06012, 2019 WL 2902494 (C.D. Cal. Feb. 28, 2019).

### C.  Aimee McBain

Aimee McBain, an employee of The Weinstein Company in 2017, filed a summons with notice, a New York State Court procedure in which a plaintiff can file a notice to satisfy a statute of limitations without filing a full complaint.  Ms. McBain has claims for a hostile work environment under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights ("NYCHRL") against the Debtors.  She also has human rights law claims against certain former directors and officers of the Debtors, including former TWC co-CEO Robert Weinstein, who may be liable on an aiding and abetting theory.  Ms. McBain's claims are not derivative of claims against the Debtors.  The aiding and abetting theory under which Ms. McBain would proceed against the former directors was approved by one trial court in New York state court against Robert Weinstein.  *Rehal v Weinstein*, 2019 WL 2088435 (N.Y. Sup Ct, New York County May 13, 2019).  However, under the Plan, she will not be permitted to pursue those claims.

### D.  Alexandra Canosa

Ms. Canosa, an actress, was raped and sexually assaulted by Harvey Weinstein on multiple occasions.  Ms. Canosa is the plaintiff in *Canosa v. Weinstein et al.*, No. 1:18-cv-4115, pending in the United States District Court for the Southern District of New York.  Ms. Canosa has asserted the following claims against Harvey Weinstein which have survived defendant's motion to dismiss (by order of the Honorable Paul A. Engelmayer, U.S.D.J. on January 28, 2019): Battery, assault, intentional infliction of emotional distress, sexual assault, false imprisonment, New York State Human Rights Law, New York City Human Rights Law, Trafficking Victims Protection Act, and California law claims.  Ms. Canosa also asserted claims against various Former Representatives for negligent supervision, hiring and retention, aiding and abetting, New York State Human Rights Law, New York City Human Rights Law, quid pro quo harassment, hostile work environment, ratification, sex discrimination - disparate impact and hostile work environment based on sex.  The district court dismissed all of Ms. Canosa's claims against the Former Representatives by decision dated January 28, 2019, which cannot currently be appealed due to the finality rule, as Ms. Canosa's case is still ongoing by virtue of her other claims against other defendants.  Her case is currently in discovery against Harvey Weinstein, The Weinstein Company, LLC and the Weinstein Company Holdings, LLC, which she had been aggressively pursuing.

## II.    **The Confirmed Plan**

The Plan contains Third Party Non-Consensual Releases[5] that affect the rights and claims of Appellants set forth in their direct lawsuits against non-debtor parties.  Through the Plan, Appellants are being forced to release the Released Parties.[6]

The Released Parties are divided into romanettes (i) – (iii).  Romanette (i) includes the Former Representatives.[7]  (A0618).  Romanette (ii) includes "(ii) professionals of firms specified

---

[5] **7.2.2. *Releases by . . . Holders of Claims . . . .*** (ii) each present and former Holder of a Claim …, will be **deemed** to unconditionally, completely, and forever **release, waive, and disclaim** the Released Parties of and from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including **any direct** or derivative claims asserted or assertable by or on behalf of … any Holder of a Claim … , any Claims or causes of action asserted by … any Holder of a Claim … that … any Holder of a Claim or Interest would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, matured or unmatured, accrued or not accrued, foreseen or unforeseen, **existing or hereinafter arising**, in law or equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities, or these Chapter 11 Cases . . . ." (A0579) (**emphasis** added).

[6] "Released Parties" means: **(i)** the Debtors, the Estates, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, the Former Representatives and the Insurance Companies; **(ii)** professionals of firms specified in Schedule 1 to the Plan; and **(iii)** each such persons' or entities' current and former officers, directors and board representatives, predecessors, successors, assigns, insiders, subsidiaries, Affiliates, principals, equity holders, members, trustees, partners, managers, employees, agents, members of any boards or similar bodies of such persons, advisory board members, insurers, reinsurers, and such persons' respective heirs, executors, estates, and nominees, in each case as applicable and in their capacity as such, with respect to liability for the actions or inactions of the Former Representatives, the Debtors, the Estate, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies; provided, however, those persons or entities who fall within subparagraph (iii) (other than persons or entities specified in subparagraphs (i) and (ii)) are not released with respect to their own actions related to Sexual Misconduct Claims, regardless of their relationship with the Former Representatives, the Debtors, the Estates, NonDebtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies, to the extent such action constitutes aiding, abetting or conspiracy to prevent the disclosure of or to cover up any Sexual Misconduct Claim (each a "Non-Released Party"). (A0618) (**emphasis** added).

[7] The Former Representatives are the following persons: Robert Weinstein, Tarak Ben Ammar, James Dolan, Frank Gil, David Glasser, Richard Koenigsberg, Marc Lasry, Lance Maerov, Jeff Sackman, Tim Sarnoff, Barbara Schneeweiss, Paul Tudor Jones, and Dirk Ziff.  (A0614.)

in Schedule 1[8] to the Plan." *Id.*   Romanette (iii) includes a long list of unidentified persons and entities that includes, for the professionals of firms set forth in romanette (ii), each of such persons' or entities'. . . managers, **employees** . . . ." *Id.* (**emphasis** added).   For example, Lewis Brisbois, the law firm that represented Harvey Weinstein, is included in romanette (ii), the Released Professionals Schedule.   (A0688).   Romanette (iii) includes current and former employees of Lewis Brisbois.   This ostensibly includes current and former secretaries employed at Lewis Brisbois.

The Plan also contains a Channeling Injunction:

**5.8.  Channeling Injunction.**  From and after the Effective Date: (i) all Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order, except that Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction; (ii) upon the funding of the Sexual Misconduct Claims Fund by the Insurance Companies on behalf of the Released Parties (and Harvey Weinstein, but only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct who affirmatively elect to release Harvey Weinstein), the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with the Sexual Misconduct Claims; (iii) if a Holder of a Sexual Misconduct Claim affirmatively elects to release Harvey Weinstein, Harvey Weinstein shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with such Holder's Sexual Misconduct Claims, *provided*, *however*, that nothing in the Plan shall preclude any action by the Settlement Parties to enforce the Plan, and nothing shall preclude any Holder of a Sexual Misconduct Claim who does not affirmatively elect to release Harvey Weinstein from pursuing an action against him in another court of competent jurisdiction. Further, nothing in this Section 5.8 or the Channeling Injunction shall constitute or be deemed a waiver of any claim, right or Cause of Action connected to any Sexual Misconduct Claim by any Settlement Party against any Entity that is not a Released Party.   The Plan Proponents will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.   Accordingly, the Channeling Injunction shall be binding upon, and

---

[8] *See* Schedule 1 (the "<u>Released Professionals Schedule</u>").  (A0688.)

enforceable by its terms against, all Holders of Sexual Misconduct Claims, irrespective of whether any such Holder (i) has voted to accept the Plan or (ii) has agreed to be bound by the Channeling Injunction, in both cases, only because the Class consisting of the Holders of Sexual Misconduct Claims (Class 4) has voted to approve the Plan in accordance with section 1126(c) of the Bankruptcy Code. ***In order to supplement the injunctive effect of the Bankruptcy Injunctions, and pursuant to sections 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date***:

**5.8.1 Channeling Injunction Terms.** In order to (i) preserve and promote the Settlement and the Plan and (ii) supplement, where necessary, the effect of the injunctions and the releases described in Sections 7.2 and 7.3 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons and Entities that (a) have held or asserted, or that hold or assert, or that may hold or assert in the future, any Sexual Misconduct Claims against the Released Parties, or any of them or (b) have affirmatively elected to release Harvey Weinstein, each shall have recourse solely to the Sexual Misconduct Claims Fund and each shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Released Party or Harvey Weinstein with respect to any Sexual Misconduct Claims, including, but not limited to:

(1)    commencing or continuing, in any manner, whether directly or indirectly, any suit, actions or other proceedings of any kind with respect to any Sexual Misconduct Claim against any of the Released Parties or Harvey Weinstein or against the property of any of the Released Parties or Harvey Weinstein;

(2)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, whether directly or indirectly, from any of the Released Parties or Harvey Weinstein, or the property of the Released Parties or Harvey Weinstein, any judgment, award, decree or other order with respect to any such Sexual Misconduct Claim against any of the Released Parties, Harvey Weinstein or any other person;

(3)    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind relating to any Sexual Misconduct Claim against any of the Released Parties or Harvey Weinstein, or the

property of any of the Released Parties or Harvey Weinstein;

(4)  asserting, implementing or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any Sexual Misconduct Claim of any kind, whether directly or indirectly, against (i) any obligation due to any of the Released Parties or Harvey Weinstein, (ii) any of the Released Parties or Harvey Weinstein; or (iii) the property of any of the Released Parties or Harvey Weinstein; and

(5)  taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Sexual Misconduct Claim.

(A0572-A0573).

## III.   **The Confirmation Hearing**

The confirmation hearing on the Plan was conducted on January 25, 2021 (the "Confirmation Hearing").  The Plan Proponents submitted certain declarations in support of confirmation including the Declaration of Ivona Smith ("Smith Decl.") (A0829). The following facts were adduced on cross examination at the Confirmation Hearing:

### A.   **The Debtors are Liquidating, not Reorganizing**

Ms. Ivona Smith,[9] director of the Debtors, testified as follows:

Q: The proposed plan before the Court is a plan of liquidation. True?

A: It's a Chapter 11 plan of liquidation, yes.

Q: And it's a plan of liquidation because the debtors are not currently operating and has no plans to operate in the future[?]

A: That is correct.

---

[9] Ms. Smith is employed by Drivetrain, LLC, *see* Transcript of January 25, 2021 Confirmation Hearing ("Tr.") at 43:15-16 (A2574), but was hired in April 2018 to serve as a Director of The Weinstein Companies, Tr. at 41:14-16 (A2573).

> Q:  And the plan is not filed to save anyone's job, right?
>
> A:  That is correct.
>
> Q:  The debtors have no current employees[?]
>
> A:  Correct.
>
> Q:  And the debtors are not generating any revenue from business operations[?]
>
> A:  That is correct.

Tr. at 42:13-43:1 (A2574).

**B.      Votes in Class 4 were all Tabulated at $1 each for Voting Purposes**

Holders of substantial economic claims for rape and sexual assault were discounted to $1 for voting purposes, and valued the same as holders of claims for verbal sexual harassment or claims that potentially were not cognizable.  (A0031).  Based on that voting scheme, holders of claims in Class 4 of the Plan voted to accept the Plan.

**C.      The Bankruptcy Court Did Not Make Specific Findings that the Third Party Non-Consensual Releases Satisfied the Continental Hallmarks and the Master Mortgage Factors such as Substantial Contributions to the Plan or Identity of Interest with the Debtors.**

The definition of Released Parties is expansive and divided into romanette (i) – (iii).  The Plan Proponents made *no* evidentiary showing that the unidentified categories of persons and entities broadly described in romanette (iii) made *any* contribution to the Plan or shared an identity of interest with the Debtors.

With respect to romanette (ii), the Plan Proponents failed to show that *any* of the law firms identified in Released Professionals Schedule are entitled to a Third Party Non-Consensual Release.  None of the law firms made a substantial (or any) contribution to the Plan or shared an identity of interest with the Debtors.  The Plan Proponents provided no evidence that Lewis Brisbois or any of the other lawyers for the Former Representatives identified on Released

Professionals Schedule made *any* contribution to the Plan.  Ms. Smith testified they were just "representing their clients."  Tr. at 75:5-76:14.  (A2641).

### D.    The Plan Proponents Did Not Substantiate Non-Consensual Releases for the Former Representatives.

None of the Former Representatives made an *affirmative* contribution to the Plan.  To the contrary, in aggregate (and without allocation) they *received* a payment of about $9.7 million (A0570), which is approximately 28% percent of all amounts being distributed pursuant to the Plan.  The Former Representatives do not hold claims *against the Estates* worth $9.7 million.  In fact, their claims *against the Estates* are worthless.  They are unliquidated, contingent, subject to dispute and, at best, unsecured.  They were not even entitled to vote on the Plan.  All other unsecured creditors are receiving a 1.46% distribution under the Plan.[10]   The Former Representatives should not receive a distribution preference above other unsecured creditors *with respect to their claims against Estates*.

The consideration for the Third Party Non-Consensual Releases granted to the Former Representatives *by the Debtors* under the Plan is, according to the Plan Proponents, the Former Representatives' agreement to take less than what they allegedly are owed *by the Debtors' Insurance Companies* for reimbursement of their legal costs from defending actions against them. The Plan Proponents did not present evidence for the Bankruptcy Court to make specific findings to support the relief granted by the Debtors and their Estates.  The Plan Proponents failed to show the Former Representatives had and waived *valid* and *valuable* claims against the Debtors and their Estates or even the Insurance Companies.

---

[10] *See* Liquidation Analysis, attached as Ex. B to the *Fourth Amended Disclosure Statement in Support of the Fourth Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors.*  (A0078).

### E.      The Plan Proponents Must (But Failed to) Substantiate the Third Party Non-Consensual Releases for each Former Representative on an Individual Basis.

The Former Representatives allegedly incurred in aggregate approximately $20 million in legal fees.  Tr. at 71:19.  (A2603).  According to the Plan Proponents, the thirteen (13) Former Representatives[11] allegedly waived an aggregate amount of approximately $10 million in attorney's fees and that served as consideration for the releases.  The Bankruptcy Court, however, erred by, *inter alia*, considering them *as a single group* for purposes of each of them *individually* obtaining Third Party Non-Consensual Releases.  No evidence was presented as to the allocation of legal fees, so it was never shown that *each* Former Representatives actually even incurred legal costs.  When asked for an allocation of what each of the Former Representatives was contributing in waived fee reimbursement, Ms. Smith responded that she had no idea. Tr. at 70:10-22.  (A2602).  Notably, the Plan Proponents failed to quantify the amount of legal fees purportedly waived by Robert Weinstein.  Tr. at 69:22-70:6, 70:23-71:1.  (A2601).

The Insurance Companies never acknowledged they owed *any* defense costs to the Former Representatives.  The invoices totaling $20 million were never submitted to the Court.  Ms. Smith testified at the Confirmation Hearing that she "do[es]n't even know if [the Former Representatives] submitted invoices," Tr. at 70:16.  (A2602), that "nobody has ever shown [her] an actual invoice," Tr. at 71:6.  (A2603), that she is "not aware if [the asserted fees]'ve been reviewed for reasonableness, Tr. at 71:9-10.  (A2603), that she has "not investigated the invoices behind the legal directors and their legal defenses," Tr. at 72:14-15 (A2604), and that she "do[es]n't know any of the arrangements that any of the Former Representatives had with their attorneys in terms of what they're going to have to pay and what they don't," Tr. at 73:6-10.  (A2605).

---

[11] *See supra* at n.7.

Without the invoices and evidence as to what each Former Representative owed, the Bankruptcy Court could not assess whether each of the Former Representatives made any contribution, no less a substantial contribution, to the liquidation of the Debtors. The Plan Proponents also did not put forth any evidence showing the Insurance Companies acknowledged their duty to defend the lawsuits against the Former Representatives or that they had agreed to reimburse the alleged legal fees of the Former Representatives in the event the Plan was not confirmed. It is possible that if the Plan was not confirmed the Insurance Companies would have contested that such fees are reimbursable or, even if reimbursable, the amounts asserted may have been subject to substantial reduction on reasonableness or other grounds.

## IV.    **The Appeal**

On February 9, 2021, Appellants filed a notice of appeal [Bankr. D.I. 3228] (the "Appeal") from the Confirmation Order. (A2654).

On February 9, 2021, Appellants filed their *Emergency Motion for Stay Pending Appeal of Confirmation Order* in the Bankruptcy Court [Bankr. D.I. 3230]. (A2826). The Bankruptcy Court entered an order [Bankr. D.I. 3252] denying the motion on February 17, 2021. (A3006).

On February 18, 2021, the Debtors filed the *Notice of Effective Date and Entry of Order Confirming Plan Proponents' Fifth Amended Joint Chapter 11 Plan of Liquidation* [Bankr. D.I. 3258]. (A3007).

On February 19, 2021, Appellants filed their *Emergency Motion for Stay Pending Appeal of Confirmation Order* again in the District Court [District Court D.I. 4] (the "*Motion for Stay*"). On March 16, 2021, this Court entered a Memorandum Opinion [District Court D.I. 16] ("Opinion") (A3009) and Order denying the stay [District Court D.I. 17]. The Court held that Appellants had not met their burden of demonstrating that they were likely to prevail on their appeal or irreparable harm in the absence of a stay. Opinion at 16 (A3009).

On March 26, 2021 the Appellants filed a Notice of Appeal in the Third Circuit Court of Appeals, appealing from this Court's order denying the stay [Third Cir. Case No. 21-1598, D.I. 1]. On March 29, 2021, the Appellants filed their *Emergency Motion for Stay Pending Appeal* [Third Cir. D.I. 4]. On April 8, 2021 Appellee Dean A. Ziehl, the Liquidation Trustee, filed his opposition to the motion [Third Cir. D.I. 8].

## **SUMMARY OF THE ARGUMENT**

The Bankruptcy Court's conclusion that the Third Party Non-Consensual Releases were "necessary to the reorganization" and "fair" —two of the hallmarks for coerced releases set forth in *Continental*—is not supported by the factual record and is clearly erroneous. Similarly, the Bankruptcy Court's conclusion that the Released Parties made a "substantial contribution" to the Plan and shared an "identity of interest" with the Debtors—two of the *Master Mortgage Factors*— was not demonstrated with specific findings. To the contrary, the vast majority of Released Parties made no *affirmative* contribution to the Plan and none of them made a substantial contribution. Nor did the Plan Proponents demonstrate an identity of interest between the Debtors and each Released Party because it is not true that a third party claim against the Released Party; *e.g.,* Appellants' claims against Robert Weinstein, would have depleted the Estates. The Estates were administratively insolvent and the Plan Proponents never demonstrated that the contingent and unliquidated claims of the Former Representatives had validity or value.

The Third Party Non-Consensual Releases also do not meet the hallmark requirement of fairness. Under state law,[12] releases sound in contract. A release must be knowing, voluntary and for consideration. There must be some manifestation of assent to release another party. But here, the releases are being forced upon Appellants over their objection, purportedly as a matter of

---

[12] The Plan provides it is governed by Delaware state law. Plan at § 14.6. (A0598).

bankruptcy law.  The rationale is that Class 4 (which includes Appellants) voted in favor of the Plan, and Appellants are thereby bound.  But the claims in Class 4 was overly broad and included sexual misconduct claims ranging from rape and sexual assault to sexual verbal harassment.  The voting and tabulation scheme for Class 4 was not conducted in accordance with 11 U.S.C. § 1126(c) and therefore not fair.  Section 1126(c) aligns voting power with the magnitude of the economic claim asserted; i.e., claimants with a larger economic stake in the plan's outcome are afforded a larger voice.  Based on the severity of the sexual abuse several of the Appellants' suffered, they should have had a larger vote in accordance 11 U.S.C. § 1126(c).[13]  But the Plan tabulated votes by treating women who had vastly greater economic claims the same as women who had lower amount claims or claims that might not even be allowed or cognizable; *e.g.*, women whose claims were outside the applicable statute of limitations or those who merely experienced "inappropriate behavior" by Weinstein, as opposed to a cognizable cause of action.  This was far from fair.  Rape and sexual assault victims' claims should not be reduced to nominative creditors, having a $1 value for voting purposes.  Denying Appellants their rightful voice in plan formulation was far from fair and is a form of re-victimization.

## ARGUMENT

## I.  The Bankruptcy Court erred in approving the Third Party Non-Consensual Releases.

The Bankruptcy Court forced rape and sexual assault victims to release their direct[14] tort claims against the Former Representatives and the other Released Parties.  Through the Third Party

---

[13] 11 U.S.C. § 1126(c) provides that an entire class of claims is deemed to accept a plan if the plan is accepted by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in the class.

[14] The claims asserted by Appellants are direct claims.  They are not derivative claims of the Debtors or property of the estate.

Non-Consensual Releases, the confirmed Plan completely and permanently insulates the current and former board members from all accountability and liability with respect to Harvey Weinstein's more than twelve- year history of sexual misconduct at The Weinstein Company, which he co-founded with Robert Weinstein in 2005.

The Third Circuit addressed the use and appropriateness of Third Party Non-Consensual Releases in *Continental*.  In *Continental*, the Court stated that "[t]he hallmarks of permissible non-consensual releases [are] **fairness, necessity to the reorganization, and specific factual findings to support these conclusions**."  11 U.S.C. § 214 (**emphasis** added).  Subsequently, lower courts addressing third party non-consensual releases have referred to various factors in determining their appropriateness.  Such factors include the plan proponent demonstrating that each Released Party made a substantial contribution to the reorganization and shares an identity of interest with the Debtor such that a claim against the Released Party is tantamount to a claim against the Debtor and depletes the Estate.[15]

At the trial level, the Plan Proponents did not come close to meeting the "exacting standards" required "if such releases and injunctions are to be permitted."  *In re Millennium Lab Holdings II, L.L.C.*, 945 F.3d 126, 139 (3d Cir. 2019).  There are no "exceptional facts" warranting the extraordinary relief provided in the Plan.  *Id.* at 129.  Granting forced releases for the benefit of the Released Parties was clearly erroneous because: (a) *no* evidence was submitted to support that relief for the vast majority of the Released Parties and (b) with respect to certain of the Former Representatives, the scant evidence provided was general in nature and insufficient to be able to determine, with the specificity required, what *each* of the Former Representatives actually contributed to the Plan or how they shared an identity of interest with the Debtors.

---

[15] *See supra*, n. 4.

### A.    The Debtors are Liquidating, Not Reorganizing.

Forced releases for non-debtors should be invoked sparingly and only in the context of a *reorganizing* debtor that is seeking a fresh start and entitled to a discharge.  In *Continental*, this Court considered a provision in Continental's confirmed plan that "released and permanently enjoined shareholder lawsuits against certain of Continental Airline's present and former directors and officers who were not themselves in bankruptcy."  *Continental,* 203 F.3d at 205.  The Court noted that several circuit courts of appeal have flatly rejected that relief incorporated into a plan because it is "indistinguishable from a bankruptcy discharge" and because of the express provisions of 11 U.S.C. § 524(e).[16]  *Id.* at 212 (internal citations omitted).

The Court considered how other circuits had dealt with the issue, considering such noteworthy *reorganizations* as *Drexel*, *Manville* and *Robins*.  *See Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("*Drexel*"); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989) ("Robins"); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("*Manville*").  The panel noted that "[a] central focus of these *reorganizations* was the global settlement of massive liabilities against the debtors and co-liable parties."  *Continental,* 203 F.3d at 212 (*emphasis* added).

In contrast to the surveyed cases, the Third Party Non-Consensual Releases here are *not necessary to the reorganization* because *there is no reorganization in these cases.*  This is not a mass tort case with non-debtors' businesses in the supply chain being sued thereby jeopardizing the reorganization of the debtor's business.  The Plan is not preserving and protecting the Debtors'

---

[16] 11 U.S.C. 524(e) provides in relevant part:  "[the] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

enterprise value or saving any jobs.  The Debtors are simply liquidating, which they could easily accomplish in chapter 7.[17]  The Third Circuit has *never* approved Third Party Non-Consensual Releases in the context of a liquidation case.  Indeed, even in the context of an actual reorganization, the Third Circuit cautioned the danger of courts approving non-consensual third-party releases "simply because reorganization financers demand them."  *In re Millennium Lab Holdings II, L.L.C.*, 945 F.3d at 139.  That is precisely what is happening here.  Appellants are being forced to release their direct tort claims against every non-debtor Released Party (other than Harvey Weinstein) because the Insurance Companies, who are funding the Debtors' Plan of liquidation, demand that relief from the Debtors as a condition to funding the Plan.

In the Opinion, this Court held that Appellants had not demonstrated a likelihood of success because the Third Circuit has not explicitly held that nonconsensual third-party releases are unavailable in the context of a liquidating debtor.  Opinion at 6-7 (A3015).  But the Plan Proponents had the burden of showing that their proposed Plan was confirmable, and they were unable to cite *any* appellate decision from *any* jurisdiction upholding a nonconsensual third-party release in a liquidation case.  Moreover, *Continental* and *Millennium* provide that approval of such releases are the exception, and only appropriate where such releases are "necessary to the organization."  *See also In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 738 (Bankr. N.D. Ohio 2019) (non-consensual releases of non-debtors considered "extraordinary" relief); *In re Aegean Marine Petrol. Network, Inc.*, 599 B.R. 717, 726 (Bankr. S.D.N.Y. 2019) (same).  The Bankruptcy Court failed to provide any rationale for how this hallmark requirement possibly can be met when the Debtors are not "reorganizing," but rather are ceasing to exist. The anomalous result achieved here

---

[17] On May 14, 2019, the Debtors themselves filed a *Motion for an Order (I) Converting Their Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code and (II) Granting Related Relief* [Bankr. D.I. 2357].

is that the non-debtor Released Parties received *de facto* discharges in these liquidating cases where the debtors themselves were not entitled to a discharge.  *See* 11 U.S.C. § 1141(d)(3).

The Plan Proponents have cited a few lower court cases approving nonconsensual third-party releases for a debtor that had ceased operations.  Those decisions either did not involve contested matters or are otherwise distinguishable.  For example, in *In re Blitz U.S.A., Inc., et al.*, 2014 WL 2582976 (Bankr. D. Del. 2014) ("*Blitz*"), the contribution by the insurance companies was clearly established with admissible evidence, expert testimony, and it was substantial and tangible.  Certain participating insurers in that case contributed substantially by buying back the entire face amount of their policies for over $137 million.  *Id*. at *4.  Here, the Insurance Companies are *not* buying back or assigning their policies to the Estates.  They are contributing only a small fraction of the towers of available proceeds.  In *Blitz*, expert testimony was presented to the bankruptcy court as to the probable value of "pending Covered Blitz Personal Injury Claims in the tort system[]" and it was determined the amount funded into the "Blitz Personal Injury Trust" exceeded that estimated amount by approximately $61 million.  *Id*.  There also was expert testimony that holders of Covered Blitz Personal Injury Claims fared better than projected recoveries in the tort system.

The Plan Proponents here made no such showing by way of expert testimony or otherwise.  The plan in *Blitz* also "provides holders of Blitz Personal Injury Claims with the opportunity to reject the settlement offers they receive from the Blitz Personal Injury Trust and resort to the tort system to liquidate their claims."  *Id.* at *19.  The Plan here does not provide the same opt-out.

*In re United Steel Enterprises, Inc.*, No. 03-50284 (NLW), 2009 WL 1025398 (Bankr. D.N.J. Jan. 15, 2009), cited by the Plan Proponents in opposing a stay pending appeal, is

distinguishable.   The third-party releases were not opposed by creditor who would have been affected by them.  *Id.* at *14.

**B.      The Hallmark "Necessary to the Reorganization" Should Have Meaning Beyond the Already Existing Confirmation Criteria.**

In *Continental,* the Third Circuit established "necessary to the reorganization" as one of the hallmarks for non-consensual releases.  *Continental*, 203 F.3d at 214.  The Plan Proponents incorrectly conflated that hallmark with certain 11 U.S.C. § 1129(a) confirmation criteria—the Best Interests of Creditors Test[18] and Plan Feasibility Test.[19]  However, every confirmed plan of liquidation requires a finding that the plan meets the Best Interests of Creditors Test and Plan Feasibility Test.   The Plan Proponents, therefore, reduced the hallmark "necessary to the reorganization" to a redundancy of certain confirmation requirements**.**

This Court should not interpret the hallmark "necessary to the reorganization" to just mean that third party non-consensual releases will be granted in exchange for funding whatever amount is necessary to confirm a plan of liquidation.  The analysis should *not* be limited to:  are holders of Sexual Misconduct Claims faring better under the Plan than chapter 7?  That test—the Best Interests of creditors Test and Plan Feasibility Test—already exists to confirm any plan.

Unlike trade creditors, Appellants did not *choose* to do business with the Debtors.  The Plan should not be a jurisdictional "trap" for tort victims who are involuntary creditors of the

---

[18] Congress created a confirmation criteria commonly referred to as the "Best Interest of the Creditors Test."  11 U.S.C. § 1129(a)(7)(A)(i–ii).  Under this test, every creditor to a chapter 11 plan must receive at least the liquidation value of its claim as it would in a chapter 7 proceeding against the debtor in order for the court to find the plan is in the creditor's best interest.

[19] To confirm a plan, the debtor must demonstrate that confirmation is not likely to be followed by the liquidation of the debtor.  *See* 11 U.S.C. § 1129(a)(11).  This requirement is commonly referred to as the "feasibility" requirement.

Debtors.  Because tort victims did not assume the credit risk of transacting business with the debtors, the analysis should not be limited to whether they fare better under the plan or in chapter 7.  For these tort victims, at a minimum, the confirmation analysis should include admissible evidence whether they are faring better under the Plan or the tort system, as was the case in *Blitz*.  In any event, there should be an opt-out provision from the Plan if a tort victim chooses to return to the tort system.

If the "necessity to reorganization" hallmark means only that non-consensual releases are available for non-debtors whenever a bankruptcy plan provides more money to creditors than they would otherwise receive in chapter 7, the bankruptcy court would not need to make *specific findings* to justify these releases, as required by *Continental*.  Such an approach would turn the availability of third party non-consensual releases into to a simple arithmetic calculation, one that already exists under the "best interest of creditors test."  If that standard is adopted, it means that Third Party Non-Consensual Releases are for sale.  If an insurance company's analysis shows more exposure in the tort system than the cost of funding a plan of liquidation, the insurance company will put forward a restructuring agreement to fund a plan conditioned on granting non-consensual releases to the insurance company.

The Plan here involves primarily the adjustment of the insurance company-tort claimant relationship, not the debtor-creditor relationship.  The Third Party Non-Consensual Releases are not *necessary* to the Debtors' liquidation.  Instead, they are only a condition to the Insurance Companies' *funding* the liquidation.  Here, non-debtor third parties, without filing for bankruptcy, acting as fiduciaries or opening their finances to scrutiny, are receiving more robust relief from the Bankruptcy Court than the Debtors are entitled to receive as matter of law.  It would be an

anomalous result if non-debtors receive a *de facto* discharge in a case where the Debtors themselves are not entitled to a discharge.

### C.       The Forced Releases are Not Fair.

The Third Party Non-Consensual Releases are not fair because Appellants do not agree to release the defendants they named in their lawsuits and wish to continue their path to justice that, in these cases, significantly, includes non-monetary considerations.  A release sounds in contract, is consensual, and should never be imposed as a matter of law on a rape/sexual assault victim.  The Plan is governed by the laws of the State of Delaware, and the Plan Proponents can point to no Delaware law that authorizes a non-consensual release.  A release or waiver is contractual in nature and requires that it be knowing, voluntary and for consideration.  There is nothing fair in finding that Appellants "release" and "waive" their claims against the Released Parties when, in fact, they do not.

In the context of the Motion to Stay, this Court found that the Non-Consensual Third Party releases were fair because the Plan provides for reasonable compensation and the class of Weinstein sexual misconduct victims voted in favor of the Plan.  Opinion at 12-13 (A3021).  Again, that conclusion is only reached if the Court incorrectly equates "necessity to reorganization" with the "Best Interests of Creditors Test."   In assessing "fairness," the Court should also consider the tabulation of votes for purposes of determining acceptance by Class 4 holders of Sexual Misconduct Claims.  That process was far from fair.  The Bankruptcy Code expressly provides that creditors with larger claims at stake are given a larger voice in voting on a plan.  Section 1126(c) provides that a plan may only be confirmed if **two-thirds in dollar amount** and one-half in number in each class vote to approve the plan.  Fairness in plan voting is achieved by aligning greater voting power with claimants that have a larger economic stake in the outcome.

Voting in this case was not conducted that way.  Instead, the votes of rape and sexual assault victims were discounted to $1.  That meant the voting power of Appellants was reduced to the voting power as claimants who were victims of less serious verbal sexual harassment or even claims that were barred by the statute of limitations.  The voting scheme used to confirm the Plan deprived rape and sexual assault victims the greater voice they were entitled to under section 1126(c).  The Plan unfairly disenfranchised Appellants.

The Plan also was not fair because it did not permit women to opt-out of the Sexual Misconduct Claims Fund and return to the tort system.  The Plan allows women not to release Harvey Weinstein *only*.  There is no opt-out for any other person or entity.  And the limited "opt-out" as to Harvey Weinstein is illusory.  The Plan severely penalizes women who decline to release him, requiring them to forego 75% of their recovery under the Plan.  Surcharging women in this way for pursuing Harvey Weinstein is re-victimization.  The economic penalty imposed by the Plan for not releasing Harvey Weinstein no doubt was calculated to encourage women to release Harvey Weinstein.

The Bankruptcy Court also failed to consider that the Plan because the Sexual Misconduct Claims Examiners—Jed Melnick and Simone Lelchuk—were the mediators who previously and unsuccessfully mediated the Non-Consenting Sexual Misconduct Claims.  By accepting a decision-making role in a case in which they previously served as mediators without the consent of the Non-Consenting Sexual Misconduct Claimants, Mr. Melnick and Ms. Lelchuk have violated basic ethical standards governing mediators.  ABA Model Standards of Conduct for Mediators, Standard (VI)(A)(8) (a mediator "shall not undertake an additional dispute resolution role in the same matter without the consent of the parties.").  Thus, in addition to stripping the Non-Consenting Sexual Misconduct Claimants of their right to pursue their claims, the Plan provides

that the value of their claims will be assessed by biased, ethically-compromised decision makers. This is the antithesis of "fairness."

### D.     The Debtors' Chapter 11 Cases are Notorious, Not Exceptional.

The Debtors' bankruptcy cases are notorious, *not* extraordinary.  This is not a mass tort case with a viable going-forward business and thousands of jobs at stake.  Here, there are only 55 potential holders of Class 4 Sexual Misconduct Claims and some of those claims may be unenforceable because of the statute of limitations or other reasons. The Plan is **for** liquidation, *not* reorganization.  The Debtors are not engaged in any business, so the Plan does not preserve and protect a going concern.  The Plan does not save jobs; there are no employees.  The Debtors' few remaining assets just as easily could be administered in chapter 7.[20]  The Plan was filed to adjust the insurance company–tort claimant relationship; not the debtor–creditor relationship, and grant Insurance Companies, Former Representatives and others *de facto* discharges.

In the context of the Motion for Stay, this Court found that "exceptional circumstances" justified the Non-Consensual Third Party Releases based the Bankruptcy Court's conclusion that some of Harvey Weinstein's victims would be unlikely to recover anything unless the Plan was approved.  Opinion at 14 (A3023).  But it is entirely speculative, and implausible, that the Plan would fall apart if Appellants were permitted to proceed with their legal claims in the tort system against non-debtors.  Moreover, even if were true that the Plan could not go forward without the coercive releases at issue here, there is no authority to support the District Court's conclusion that "exceptional circumstances," as defined by *Continental*, includes the desire to compensate a sympathetic group of claimants who otherwise may not have recourse in the tort system.

_____

[20] The Debtors previously sought authority to convert their cases to chapter 7.  *See Motion for an Order (I) Converting Their Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code and (II) Granting Related Relief* [Bankr. D.I. 2357].

Ultimately, these cases are notorious because of disgraced Harvey Weinstein, and the Debtors' Former Representatives that allegedly looked the other way and failed to supervise his decade's long sexual misconduct.  The victims and survivors of Harvey Weinstein are exceptional and courageous because they came forward to hold Harvey Weinstein and the board accountable and liable, and, in so doing, improve the work environment for women around the world.  There is nothing exceptional about insurance companies paying less to fund a plan of reorganization than would cost them if they were forced to litigate further in the tort system.  And that is exactly what these cases are about.  Insurance companies are very adept at assessing risk and cost-benefit analyses.  If the insurance companies faced less risk and cost outside bankruptcy, these cases would be in liquidating in chapter 7, not chapter 11.

There is likewise nothing exceptional about a moribund chapter 11 case that lacks sufficient cash to pay its expenses of administration.  There are no secured claims against the Debtors' assets.  Tr. at 11:20-21. (A2543).  The Debtors here benefited from the fact they had potential tort exposure and towers of insurance.  That presented the opportunity for the Debtors to "sell" the vast protections of the Bankruptcy Code to the Insurance Companies.  The Debtors were administratively insolvent, had no options other than chapter 7 and therefore had little bargaining power with the Insurance Companies, who purchased greater relief than the Debtors were entitled to themselves.

The Insurance Companies agreed to fund a *de minimis* recovery to general unsecured creditors and a meager Sexual Misconduct Fund on the condition that the Plan provides the most robust relief this Court can provide: Third Party Non-Consensual Releases and a Channeling Injunction.  This Court's requirement for "exceptional circumstances" to support such

extraordinary relief should not be the lowered merely because some of Harvey Weinstein's victims may not be able to pursue claims in court.

II.   **The *Master Mortgage Factors* are Not Met**

    A.   **Bankruptcy Court erred in finding that all of the Former Representatives of the Debtors and other Released Parties made a "substantial contribution" to the Plan.**

To justify non-consensual releases, the Plan Proponents contend that the Former Representatives made a **substantial contribution to the Plan** and **share an identity of interest with the Debtors** such that a claim against the Former Representatives (and the Released Parties) is a claim against the Debtors that would deplete the estates.  This assertion was never demonstrated either with specific findings or admissible evidence in the Bankruptcy Court and is factually untrue.   The definition of Released Parties may be broken down into romanettes (i) to (iii).  Romanette (iii) includes a long list of unidentified persons and entities that includes the current and former "employees" of the law firms identified in romanette (ii), including Lewis Brisbois, the law firm that represented Harvey Weinstein.  There is no evidence that employees of Lewis Brisbois made any contribution to the Plan.  Any finding that the persons and entities in romanette (iii) made a substantial contribution to the Plan is without evidentiary support and, therefore, clearly erroneous.

Similarly, with respect to romanette (ii), the lawyers at Lewis Brisbois or the other law firms representing the Former Representatives, made no contribution to the Plan.  They merely did their jobs.  Ms. Smith testified they were just "representing their clients."  Tr. at 75:5-76:14. (A2607).  Any finding that the law firms identified in romanette (ii) made a substantial contribution is without evidentiary support and, therefore, clearly erroneous.

Romanette (i) includes the Former Representatives. Far from making a substantial contribution to the Plan, the Former Representatives actually *received* about $9.7 million;

approximately 28% of the Settlement Proceeds.   However, the evidentiary record does not demonstrate that *each* of the Former Representatives made a substantial (or any) contribution to the Plan.  The Former Representatives were defined and then incorrectly treated as a single group for purposes of the *Continental* and *Master Mortgage Factors* analysis.  To avoid mischief and abuse, each of the former directors and officers must separately qualify for a non-consensual release.

### 1.     The Invoices for Legal Fees Never Were Submitted to the Bankruptcy Court

To justify the releases, the Former Representatives alleged they incurred $20 million in legal fees that could be satisfied by the Debtors' through indemnity claims, other contractual rights or by insurance policies owned by the Debtors.  This was never demonstrated with admissible evidence.  The invoices allegedly evidencing the legal fees never were submitted to the Bankruptcy Court.  The Plan Proponents' witness never saw or reviewed the invoices.  Ms. Smith testified at the Confirmation Hearing that she "do[es]n't even know if [the Former Representatives] submitted invoices," Tr. at 70:16 (A2602), that "nobody has ever shown [her] an actual invoice," Tr. at 71:6 (A2603), that she is "not aware if [the asserted fees]'ve been reviewed for reasonableness, Tr. at 71:9-10 (A2603), that she has "not investigated the invoices behind the legal directors and their legal defenses," Tr. at 72:14-15 (A2604), and that she "do[es]n't know any of the arrangements that any of the Former Representatives had with their attorneys in terms of what they're going to have to pay and what they don't," Tr. at 73:6-10. (A2605).

### 2.     The Former Representatives' Claims Against the Debtors are Worthless and the Former Representatives Made No Contribution by Waiving Them

Even assuming the Former Representatives had claims for indemnity against the Debtors, either through an LLC or employment agreement, the claims are worthless in the context of this

liquidating case.  The long-defunct Debtor lacked the resources to pay the indemnity claims and, in any event, disavowed the contracts giving rise to the right to payment.  The Debtors' insurance companies also never acknowledged the Former Representatives' right to reimbursement for the invoices that, in any event, was a claim against the insurance companies, not the Debtors.

In *Continental*, the Third Circuit considered but dismissed certain of the district court's findings concerning D&O indemnification claims.  The district court found that "the release and permanent injunction of Plaintiffs' claims to be a 'key element' of Continental Debtors' Reorganization because the Continental Debtors were obligated to indemnify the D&Os and thus would ultimately bear the burden of Plaintiffs' lawsuits."  *Continental*, 203 F.3d at 215 (internal citations omitted).  The Third Circuit, however, found "no evidence in the record before us supporting the possibility or probability of D&O indemnification as a factual or legal matter.  Even if the D&O defendants' obligations culminating from Plaintiffs' class actions were indemnifiable, the fact that the reorganized Continental Airlines might face an indemnity claim sometime in the future, in some unspecified amount, does not make the release and permanent injunction of Plaintiffs' claims 'necessary' to ensure the success of the Continental Debtors' reorganization."  *Id.* at 216.

That reasoning applies here and is even more compelling in these cases.  The Debtors are liquidating.  The indemnity claims that the Former Representatives are releasing under the Plan are worthless.  At best, they are general unsecured claims against the Debtors that are receiving a 1.46% distribution under the Plan.  *See* Liquidation Analysis, attached as Ex. B to the *Fourth Amended Disclosure Statement in Support of the Fourth Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* [Bankr. D.I. 3098]. (A0078).  Further, the Plan Proponents never demonstrated at the trial level that: (a) *each*

of the Former Representatives has indemnity claims, (b) that such claims fall within the purview of the Debtors' actual indemnity provisions, (c) that the contracts permitting indemnity; *e.g.,* LLC operating or employment agreement, remain enforceable under the Plan (they do not); and (d) each of the Former Representatives timely filed proofs of claim.[21]   Finally, unlike the case here,[22] the Third Circuit noted "[t]he Continental Debtors elected to retain their contractual obligations under bylaws and 'assumed' employment contracts."  *Id.* at 215.

> **3.**      **The Waiver by the Former Representatives of their Claims Against the Insurance Companies are Not Claims Against the Debtors, and are Not a Substantial Contribution to the Plan**

The nonconsensual releases in favor of the Former Representatives cannot be justified on their purported partial waiver of attorneys' fees reimbursement *from the Insurance Companies*.  In *Continental*, the Court considered that "Plaintiffs' actions against the non-debtor D&O defendants implicated the Continental Debtors' D&O liability insurance policy, and thus affected property of the Continental Debtors' bankruptcy estate."  *Id.*  The Court noted:

---

[21] The failure to file a proof of claim results in the bar to any recovery from the bankruptcy estate. *See* Order (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing Deadlines for Filing Requests for Payment of Pospetition Administrative Expenses, (III) Approving Form and Manner of Notice Thereof, and (IV) Granting Related Relief [D.I. 1890] at ¶ 10.  ("Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a proof of claim or an Administrative Claim on or before the applicable Bar Date as provided herein, but fails to do so: . . . (ii) **forever shall be barred, estopped, and enjoined from asserting such claim** against each of the Debtors and their property (or filing a proof of claim or an Administrative Claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim.")  (**emphasis** added)

[22] Plan at § 8.1. (A0586) ("Except as otherwise provided for herein, and except for executory contracts and unexpired leases which the Debtors either have assumed, have rejected or have filed a motion to assume or reject prior to the Confirmation Date and which remains pending as of the Confirmation Date, all executory contracts and unexpired leases for goods, services, or premises used in connection with Debtors' business operations **shall be deemed rejected** by the Debtors on the Effective Date, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases.")  (**emphasis** added).

> We do not dispute that, some day in the future, the reorganized Continental Debtors may face litigation or experience some financial ramification based on the liabilities of the Ds&Os as a result of the indemnity obligation or the D&O liability insurance policy. However, we cannot accept the District Court's conclusion that a purported 'identity of interest' between the Continental Debtors and the non-debtor D&O defendant, forged by the indemnity obligations or the D&O liability insurance policy, established by the necessity of releasing and permanently enjoining Plaintiffs' claims, nor does this identity of interest speak to the fairness of the release and permanent injunction that we construe cases like Manville, Drexel or Robins to require. We conclude that granting permanent injunctions to protect non-debtor parties on the basis of theoretical identity of interest alone would turn bankruptcy principles on their head. Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.

*Id*. at 217.

In the context of a Motion for Stay, this Court held that the Appellants were not likely to prevail on their argument that the Former Representatives did not make a substantial contribution to the Plan based on the Bankruptcy Court's findings that the Plan would not have happened without the Former Representatives waiving part of the $20 million in attorneys' fees they would have otherwise been owed. Opinion at 9-11 (A3018). This is incorrect for several reasons. First, the Former Representatives cannot be viewed *as a single group* for purposes of waiver of legal fees and no evidence was presented as to the allocation of legal fees owed by *each* of the Former Representatives. Some of the Former Representatives may not have incurred legal costs but are being released. When asked for an allocation of what each of the Former Representatives was contributing in waived fee reimbursement, Ms. Smith responded that she had no idea. Tr. at 70:10-22 (A2602). Notably, the Plan Proponents failed to quantify the amount of legal fees purportedly waived by Robert Weinstein. Tr. at 69:22-70:6, 70:23-71:1 (A2601).

Second, the Insurance Companies never acknowledged they owed and were required to reimburse any legal fees as defense costs to the Former Representatives.  Without an admission of contractual liability, the alleged contribution is theoretical.

The conclusion that the Former Representatives made an indispensable "contribution" to the Plan by accepting "only" $9.7 million in attorneys' fees is without evidentiary foundation and entirely speculative.  The "finding" that there would not have been a Plan of Liquidation without the Former Representatives waiving a portion of the attorneys' fees they claim to be owed does not mean that each of the Former Representative individually made a "substantial contribution" to the Plan.  Thus, contrary to the Bankruptcy Court's conclusion, there is *no* evidence from which the Bankruptcy Court could have made the specific findings required under *Continental* to justify the non-consensual releases in favor of each of the Former Representatives.

**III.** **The Bankruptcy Court erred in finding that Section 105 standing alone is sufficient judicial authority to invoke the Channeling Injunction set forth in Section 5.8 of the Plan**

The Plan trips on the fact that it contains a Channeling Injunction—section 524-style relief—based solely on section 105 of the Bankruptcy Code.  While the Debtors studiously avoid mentioning section 524 in the Disclosure Statement and/or Plan, and softly describe the Channeling Injunction as based on "[s]ection 105(a) of the Bankruptcy Code *and other sections of the Bankruptcy Code* . . . [,]"(*emphasis* added),  (A0001), the Debtors fail to identify any other applicable sections of the Bankruptcy Code.

It is well-established law that section 105 has a limited scope: it allows the bankruptcy court to carry out *other sections of the Code*, but does not create substantive rights on its own and has to be used in a manner *consistent with the Code*.  *See generally Law v. Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.' . . .  Section 105(a) confers authority

to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.") (internal citation omitted); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (The equitable powers authorized by § 105(a) "are not 'without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'"); *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) ("The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be.") (internal citations omitted); *In re Morristown & Erie R.R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989) (§ 105(a) "does not give the court the power to create substantive rights that would otherwise be unavailable under the Code"); *Barbieri v. RAJ Acq. Corp. (In re Barbieri*), 199 F.3d 616, 620–21 (2d Cir. 1999) (warning the "equitable powers emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules") (citations omitted); *Opt-Out Lenders v. Millennium Lab Holdings II, L.L.C. (In re Millennium Lab Holdings II, L.L.C.*), 242 F. Supp. 3d 322 (D. Del. Mar. 20, 2017) (stating that Section 105(a) cannot be used to craft new remedies that contravene existing statutory provisions, or create substantive rights that are otherwise unavailable under applicable law); *In re KI-1, Inc.*, No. 02-10536 WS, 2006 WL 2801873, at *8 (Bankr. D. Del. Sept. 28, 2006) ("Notwithstanding that 105(a) of the Code is the basis for a broad exercise of power in the administration of a bankruptcy case, the Court has no authority to alter property rights or other rights or duties under applicable non-bankruptcy law, nor create substantive rights that are

otherwise unavailable under applicable law, except where such alteration is authorized by the Bankruptcy Code.").

Here, the Debtors contend that "Section 105(a) of the Bankruptcy Code and ***other sections of the Bankruptcy Code*** authorize the Bankruptcy Court to enter a 'channeling injunction' pursuant to which the Sexual Misconduct Claims are forever channeled to the Sexual Misconduct Claims Fund . . . .  Following the issuance of the Channeling Injunction, . . .  any and all Holders of Sexual Misconduct Claims shall be ***permanently enjoined*** from seeking satisfaction of their Sexual Misconduct Claims against the Debtors or any other Released Party or the property of any such Released Party."  (A0555) (***emphasis*** added).  However, the Plan Proponents never identify what "other sections of the Bankruptcy Code" they relied on.

Section 105, standing alone, does not provide an independent basis for the section 524-style Channeling Injunction and the broad sweeping Third Party Non-Consensual Releases contained in the Plan.  Section 105 cannot be utilized when section 524 relief is not available, and section 524 clearly is not available here.  Section 105 is not an end around section 524.  The Debtors' liquidating Plan does not permit a discharge and certainly does not permit the super-discharge the Debtors obtained here.  Section 105 is being used to lower the bar for section 524-style relief because the Debtors do not qualify for such relief.  *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 248 (3d Cir. 2004), *as amended* (Feb. 23, 2005) (In *dicta*, the Third Circuit noted "[t]he implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants.  Both the Bankruptcy Court and the District Court found the reorganized Combustion Engineering would engage in business operations after consummation of the Plan.").

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the Bankruptcy Court's decision and vacate the Confirmation Order.

Dated: April 12, 2021

Respectfully Submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE 3995)
Zhao (Ruby) Liu (DE 6436)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
rosner@teamrosner.com
liu@teamrosner.com

*Counsel to Appellants*