**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,<br>　　　　　　　Debtors.<br><br>WEDIL DAVID, DOMINQUE HUETT, ALEXANDRA CANOSA AND AIMEE MCBAIN,<br>　　　　　　　Appellants,<br>v.<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, et al. and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>　　　　　　　Appellees. | Chapter 11<br><br>Case No. 18-10601 (MFW)<br>Jointly Administered<br><br><br>Civ. Case No. 21-00171 (MN) |

## MOTION TO DISMISS APPEAL

Dean A. Ziehl, the Liquidation Trustee of the TWC Liquidation Trust (the "Liquidation Trust" or "Appellee"), formed pursuant to the confirmed and effective *Fifth Amended Joint Chapter 11 Plan of Liquidation, dated January 20, 2021* [Bankr. D.I. 3195] (the "Plan"), as successor-in-interest to, and representative of, The Weinstein Company Holdings, LLC and its affiliated debtors (collectively, the "Debtors"), moves to dismiss as equitably moot the appeal by Wedil David, Dominque Huett, Alexandra Canosa, and Aimee McBain (together, the "David Claimants" or "Appellants") from the *Order Confirming the Fifth Amended Joint Chapter 11 Plan of Liquidation* (the "Confirmation Order") [Bankr. D.I. 3203], entered on January 26, 2021 by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[1] In support of the motion, Appellee respectfully represents as follows:

---

[1] References to "Bankr. D.I. __" and "D.I. __" are to items of record on the dockets of the Bankruptcy Court and District Court, respectively.

I.       **NATURE AND STAGE OF PROCEEDINGS**

On March 19, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On November 17, 2020, the Debtors and Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Plan Proponents") filed the *Fourth Amended Joint Chapter 11 Plan of Liquidation* (Bankr. D.I. 3096).

On December 18, 2020, Appellants filed their *Objection to Fourth Amended Joint Chapter 11 Plan of Liquidation* (the "David Plan Objection") [Bankr. D.I. 3145].  On January 25, 2021, the Bankruptcy Court issued a bench ruling (the "Bench Ruling") [D.I. 4-2, 1/25/21 Hr'g Tr. at 112-19], overruling the David Plan Objection and confirming the Plan, as modified.  The Confirmation Order was issued the following day [D.I. 3203].

On February 9, 2021, Appellants filed a notice of appeal of the Bench Ruling and Confirmation Order [Bankr. D.I. 3228] and filed in the Bankruptcy Court an *Emergency Motion by Non-Consenting Sexual Misconduct Claimants for Stay Pending Appeal of Confirmation Order* [Bankr. D.I. 3230].  On February 17, 2021, the Bankruptcy Court entered its *Order Denying Emergency Motion by Non-Settling Sexual Misconduct Claimants for Stay Pending Appeal of Confirmation Order* [Bankr. D.I. 3252].  Appellants then filed in this Court their *Emergency Motion By Non-Consenting Sexual Misconduct Claimants for Stay Pending Appeal of Confirmation Order* [D.I. 4], which Appellee opposed [D.I. 11].  The motion was denied by this Court in its *Memorandum Opinion* issued on March 16, 2021 [D.I. 16] and Order thereon [D.I. 17].  Appellants appealed that decision to the Third Circuit on March 26, 2021 [D.I. 18], and on March 30, 2021, they filed a motion in the Third Circuit for a stay pending appeal. [D.I. 19].  That motion was summarily denied on April 12, 2021 [3d Cir. Case No. 21-1598; D.I. 9].

On February 18, 2021, the Debtors filed the *Notice of Effective Date and Entry of Order Confirming Plan Proponents' Fifth Amended Joint Chapter 11 Plan of Liquidation* [Bankr. D.I. 3258], giving notice that the effective date and substantial consummation of the Plan (the "Effective Date") occurred.  On the Effective Date, the Liquidation Trust was established and the Liquidation Trustee was appointed as successor-in-interest to the Debtors.  *See Plan*, § 6.3 [Bankr. D.I. 3182].

## II.   SUMMARY OF ARGUMENT

Under the standards established by the Third Circuit *In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (en banc), this appeal is equitably moot and should be dismissed:

1.   The Plan has been substantially consummated;

2.   No stay of the Confirmation Order was obtained pending the appeal;

3.   The relief requested would have a significant adverse effect on the rights of parties not before the Court, namely the creditors who overwhelmingly supported the Plan based in part on its promise of a prompt resolution of their claims, and the parties who entered into an arduously-negotiated global settlement that made the Plan possible;

4.   The relief requested would have a significant adverse effect on the success of the Plan, which is entirely dependent upon a global settlement that requires the releases that Appellants seek to invalidate, as the evidence showed and the Bankruptcy Court specifically found, and that would be undone as a result of such relief; and

5.   The public policy of affording finality to bankruptcy judgments emphatically favors dismissal of the appeal, especially where, as here, the expeditious resolution of sexual abuse claims was an important consideration in favor of the Plan.

The outcome is the same under the streamlined articulation of the test in *Samson Energy Resources Co., et al. v. SemCrude, L.P., et al. (In re SemCrude, L.P., et al.)*, 728 F.3d 314, 320-

21 (3d Cir. Aug. 27, 2013), because (1) the Plan has been substantially consummated, and (2) granting the relief will fatally scramble the plan and/or significantly harm the creditors and settling parties who justifiably relied on plan confirmation to effectuate a settlement that will provide meaningful compensation to victims of Harvey Weinstein's sexual abuse.

## III.    FACTUAL BACKGROUND

The Debtors commenced these bankruptcy cases after multiple lawsuits were filed in multiple jursidictions alleging, *inter alia*, that Harvey Weinstein engaged in sexual and other harassment and abuse, and that certain companies (including the Debtors) and their respective current and former officers, directors, and board representatives failed to stop such harassment and abuse, in violation of federal, foreign and state law.

The centerpiece of the Plan is a global settlement which provides, among other things, for nonconsensual third-party releases of insurers and former officers and directors.  In exchange for the releases, insurers will contribute a $35,214,822.30 for the benefit of the Debtors' estates and creditors, of which $17,064,525.60 will be set aside in a trust for the benefit of claimants holding sexual misconduct claims.  *See* Plan, Bankr. D.I. 3203-1 at 17, § 5.4.  In exchange for their releases, former officers and directors are contributing a significant portion of their insurance coverage rights, including a waiver of their potential indemnity claims against the Debtors and a waiver of their rights under the respective insurance policies to seek full and priority reimbursement of their defense costs.  *Id*. at 20, § 5.7.

The Plan was approved by approximately 83 percent (37) of the holders of sexual misconduct claims, and by over 96 percent in amount and number of general unsecured claims.[2] The four Appellants, the sole objectors to confirmation of the Plan, each assert claims against the Debtors, officers and directors based on alleged sexual misconduct by Harvey Weinstein.

In the David Plan Objection, Appellants argued, among other things, that the non-consensual third party release of former officers and directors proposed in the Plan did not satisfy the Third Circuit standard for approval because the release was not necessary to a reorganization, and the former officers and directors did not give fair consideration in exchange for their release.

Following an evidentiary hearing held on January 25, 2021, the Bankruptcy Court issued the Bench Ruling (*see* D.I. 4-2, 1/25/21 Hr'g Tr. at 112-19) overruling the David Plan Objection and confirming the Plan.  The Confirmation Order was entered on January 26, 2021. (Bankr. D.I. 3203).

The Plan Proponents submitted evidence that the non-consensual third-party releases of former officers and directors were the subject of extensive arm's-length negotiations among all of the parties, that the releases were necessary to the settlement and to the Plan, that the consideration was fair and that absent the settlement the almost certain result would be a chapter 7 liquidation with no economic recovery whatsoever for the survivors of Weinstein's misconduct. One of the Debtors' three Directors appointed after the chapter 11 case was filed, Ivona Smith, attested in her declaration (*Declaration of Ivona Smith*, Bankr. D.I. 3185), with respect to whether the releases were a necessary part of the global settlement, that:

---

[2] *Declaration of Stephenie Kjontvedt of Epiq Bankruptcy Solutions, LLC. Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Liquidation* (Bankr. D.I. 3160).

> Based on my knowledge of the mediation sessions, I believe that the Injunctions and Plan Releases were necessary inducement for the signatories to the Plan Support Agreement (the "Settlement Parties") to reach agreement on the contributions set forth therein and as reflected in the Settlement embodied in the Plan. Absent the Injunctions and Plan Releases . . ., I do not believe that the Settlement Parties would have reached agreement on the terms of a Plan Support Agreement and Settlement, and without the Plan Support Agreement and Settlement, I do not believe that the Debtors could formulate and consummate a confirmable chapter 11 plan.

*Id.* ¶ 5.

Based on such evidence, the Bankruptcy Court made numerous specific factual findings on the necessity of the Plan's non-consensual third-party releases.  *See* 1/25/21 Hr'g Tr. at 112:17-119:13.  It found that the nonconsensual releases were supported by exceptional circumstances, including the Plan's prospect for a meaningful recovery by victims that would be unavailable absent the global settlement.  *See* D.I. 4-2, 1/25/21 Hr'g Tr. at 117:16-21.

The Bankruptcy Court interpreted the overwhelming support for the Plan as evidencing the desire of Mr. Weinstein's victims for finality:

> 83 percent of the victims have expressed very loudly that they want closure through acceptance of this plan, that they do not seek to have to go through any further litigation in order to receive some recovery, some possible recompense for what was done to them; although, it is clear that money alone will never give them that. But I can only deal with the financial aspect of this, and the Bankruptcy Code provides that creditors should decide, as a class, how they want their claims to be treated. And in this case, both the trade creditors and the tort creditors, have come to a resolution with some recovery for the victims of Mr. Weinstein's terrible conduct.

D.I. 4-2, 1/25/21 Hr'g Tr. at 116:22-117:8.  The Confirmation Order contains corresponding findings.  *See* Conf. Order at 7-8.

The Bankruptcy Court specifically considered, and rejected, Appellants' argument that non-consensual releases can only be approved when a debtor is reorganizing, not liquidating, as

**6**

did this Court in concluding: "Appellants have failed to carry their burden of demonstrating they have a "significantly better than negligible" chance of success on the merits of their argument plans of liquidation may not contain non-consensual third-party releases."  D.I. 16, at 7.

As noted above, Appellants appealed on February 9, 2021 and sought a stay to delay consummation of the Plan by filing motions for stay pending appeal in the Bankruptcy Court, this Court and the Third Circuit, all of which were denied.  On February 18, 2021, the day after the Bankruptcy Court denied the motion for stay pending appeal, the Debtors filed their *Notice of Effective Date* (Bankr. D.I. 3258).  As noted above, on the Effective Date, the Liquidation Trust was established and the Liquidation Trustee was appointed pursuant to section 6.3 of the Plan.  *See Plan*, § 6.3 [Bankr. D.I. 3182].

Also on the Effective Date, the Sexual Misconduct Claims Fund ("SMC Fund") was fully funded, co-Claims Examiners were appointed to administer the SMC Fund, and counsel was engaged to assist the Claims Examiners.  *See Declaration of Simone Lelchuk*, filed herewith ("Lelchuk Dec."), ¶ 2.

Since the Effective Date:

1.      All settlement funds have been distributed:

      a.      $17,064,525.30 to SMC Fund

      b.      $8,407,305.00 to Liquidation Trust

      c.      $9,743,052.00 to Former Representatives

2.      The funds transferred to the Liquidation Trust have been used to pay approximately ***$4 million in allowed administrative expenses***.  In addition, the Liquidation Trust

has engaged various consultants, and incurred related fees, relating to the administration of the
Liquidation Trust, preservation of books and records, and analysis of remnant assets.

3.      The Liquidation Trust has executed and implemented post-confirmation settlement
agreements.  *See*, *e.g.*, Stipulation with Spyglass and Black Bear Pictures [Bankr. D.I. 3299].

4.      The Liquidation Trust's counsel has substituted as counsel for record in SMC-
related actions.  *See Canosa v. Weinstein, et al.*, Case No. 18-cv-04115-PAE (S.D.N.Y.).

5.      The Liquidation Trust has begun archiving all data information systems.

6.      The SMC Fund created a dedicated website to communicate with sexual
misconduct survivors.  Lelchuk Dec., ¶ 3.

7.      A long form proof of claim form (the "Claim Form') was electronically
transmitted to 91 survivors, or their counsel, on March 4, 2021. Survivors were advised, multiple
times, that the deadline to submit a Claim Form was 11:59PM (Eastern Daylight Time) on May
3, 2021 (the "Claim Deadline").  *Id.*

8.      On March 24, 2021, co-Claims Examiner Simone Lelchuk and counsel, Elise
Frejka, held a live Zoom webinar for survivors to hear directly from Ms. Lelchuk and ask general
questions about the claims process.  The webinar was thereafter published to the dedicated
website. *Id.*

9.      Counsel for the Claims Examiners has actively engaged with pro se survivors,
including assisting with introductions to pro bono counsel, and providing information and
emotional support, and with counsel for survivors.  Claims Examiners have also had direct
communications with survivors and counsel as needed and requested.  Significant time has been

**8**

spent establishing trust, creating a safe environment, and ensuring that the survivors are comfortable with the claims process.  *Id.*

10.     Fifty-five (55) unique claims were submitted as of the Claim Deadline through the claims portal. *Id.*

11.     Meetings/interviews have been scheduled with approximately 30 survivors to take place between May 17, 2021 and August 11, 2021, and more are expected.  The majority of survivors have opted to schedule these voluntary meetings.  *Id.*

12.     The Claims Examiners have begun the process of reviewing the submitted claims and retained professionals have begun running the required Medicare/Medicaid lien searches.  *Id.* The goal of the Claims Examiners is to complete the administration of the SMC Fund this calendar year and make distributions to survivors on or before December 31, 2021.  [Lelchuk Dec., ¶ 4.].  This timeline contemplates that each survivor, or counsel, will be notified in writing of the point award and estimated liquidated value of her allowed claim on or about August 31, 2021, and that the reconsideration process contemplated by section 8.2 of the Sexual Misconduct Claims Protocol will be completed by November 15, 2021 such that a final claim determination notice can be issued to each survivor on or about November 30, 2021.  *Id.*[3]

## IV.   ARGUMENT

In *Continental*, the Third Circuit identified five prudential factors to consider when evaluating whether to dismiss an appeal of an order confirming a plan of reorganization as equitably moot:

---

[3]  Whether an interim or final distribution on allowed claims can be made by years-end, however, will depend on whether any survivor seeks judicial review of the Claims Examiner's final determination.  *Id.*

**9**

(1)   whether the reorganization plan has been substantially consummated;

(2)   whether a stay of the order has been obtained pending the appeal;

(3)   whether the relief requested would affect the rights of parties not before the court;

(4)   whether the relief requested would affect the success of the plan; and

(5)   the public policy of affording finality to bankruptcy judgments.

*Continental*, 91 F.3d at 560 (3d Cir. 1996).  *See also Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001).

In *SemCrude,* Judge Ambro distilled these five factors to two: "In practice, it is useful to think of equitable mootness as proceeding in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation."  *Samson Energy Resources Co., et al. v. SemCrude, L.P., et al. (In re SemCrude, L.P., et al.)*, 728 F.3d at 320-21.[4]

Under either articulation of the test, the David Claimants' appeal of the Confirmation Order should be deemed equitably moot and dismissed.[5]

---

[4] Dismissal of an appeal on grounds of equitable mootness is well-established in other circuits as well.  *See, e.g., In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993); *In re Manges*, 29 F.3d 1034 (5th Cir. 1994); *In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993); *Rochman v. Ne. Util. Serv. Group (In re Public Serv. Co. of N.H.)* 963 F.2d 469 (1st Cir. 1992); *First Union Real Estate Equity & Mort. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.2d 1065 (11th Cir. 1992).

[5] The doctrine of equitable mootness is unaffected by the Supreme Court's decision in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1660, 203 L. Ed. 2d 876 (2019).  As the First Circuit explained recently in *Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, No. 19-1181, 2021 U.S. App. LEXIS 3411, *12-13 (1st Cir. February 8, 2021), *Tempnology* involved Article III mootness, not equitable mootness.  The former addresses the jurisdictional issue of whether a live controversy exists, whereas equitable mootness presupposes a live controversy (as exists in an appeal from plan confirmation):

> Here, by contrast, there is no contention that the case is moot under Article III. We have a live controversy: Appellants want the Plan confirmation undone, and appellees do not.  Equitable mootness bears on how we decide that controversy, not whether we have jurisdiction to decide it…. [T]he term equitable mootness is perhaps a misnomer. The doctrine might better be viewed as akin to equitable laches, the notion that the passage of time and inaction by a party can render relief inequitable.

A.     **The Plan Has Been Substantially Consummated**

The first question in the mootness analysis in both *Continental* and *SemCrude* is whether

a plan has been substantially consummated.  *Continental*, 91 F.3d at 560-61 (citing *In re Public*

*Serv. Co.*, 963 F.2d at 473-74)).  The Plan in these cases has been consummated.

"'Substantial consummation' is a statutory measure for determining whether a

reorganization plan may be amended or modified by the bankruptcy court." *Manges*, 29 F.3d at

1040.  Section 1101(2) of the Bankruptcy Code defines "substantial consummation" as:

(A)     transfer of all or substantially all of the property proposed by the plan to be transferred;

(B)     assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C)     commencement of distribution under the plan.

11 U.S.C. § 1101(2).

As set forth above, the property to be transferred under the Plan has been transferred, the

successor to the Debtors has assumed the management of all property dealt with by the Plan, and

distributions have commenced.  The Third Circuit has confirmed that such facts in the context of

a liquidation trust constitute substantial consummation:

> All of the property required to be transferred under the Plan has been
> transferred, 11 U.S.C. § 1101(2)(A), the Reorganized Debtor has assumed
> the management of the Debtor's business, *id.* § 1101(2)(B), and all
> distributions required to be made under the Plan have been made, *id.* §
> 1101(2)(C). Furthermore, the stock of SLI was cancelled and new equity
> was issued for the Reorganized Debtor. OSI contends that the Plan has not
> been substantially consummated because the litigation trust and
> professional fee transfers were placed in escrow, rather than directly
> distributed. The escrowed property, however, is irrelevant for purposes of

---

*Id.* at *13-14.  "We therefore find the teaching of *Mission Product* inapplicable here, where the issue at hand turns
not on jurisdiction but on the merits of what is in form and substance a request for equitable relief."  *Id.* at *16.

this analysis because it was irrevocably transferred in accordance with the Plan.

*Osram Sylvania, Inc. v. SLI Inc. (In re SLI, Inc.)*, No. 04-4231, 2006 U.S. App. LEXIS 5188, at

*6 (3d Cir. Mar. 1, 2006).

### B.   No Stay Pending Appeal Was Obtained

Second, no stay pending appeal has been obtained.  While Appellants have sought such

relief, they did not succeed and the Plan became effective.  To prevent equitable mootness, an

appellant must actually *obtain* a stay.  *Continental*, 91 F.3d at 562 (citing *UNR Indus*, 20 F.3d at

770).  "[T]he failure or inability to obtain a stay pending appeal carries the risk that review might

be precluded on mootness grounds."  *Manges*, 29 F.3d at 1040.  "[T]he existence or absence of a

stay is a critical factor in determining whether to dismiss an appeal under the doctrine of

equitable mootness."  *Grand Union Co. v. Saul, Ewing, Remick & Saul (In re Grand Union)*, 200

B.R. 101, 105 (D. Del. 1996) (citing *Continental*, 91 F.3d at 553); *see also Deangelis v. Official

Comm. of Unsecured Creditors (In re Kainos Partners Holding Co., LLC)*, Civil Action No. 10-

560-LPS, 2012 U.S. Dist. LEXIS 170641, at *3 (D. Del. Nov. 30, 2012)  (absence of stay critical

to district court's decision to dismiss appeal as equitably moot).

### C.   Reversal of the Confirmation Order Would Adversely Affect the Rights of Non-Parties Because It Would be Fatal to the Global Settlement and Plan

The third and fourth jurisprudential considerations under *Continental*, and central to the

*SemCrude* analysis, are whether the relief requested in the appeal affects the rights of parties not

before the court, and whether it affects the success of the plan.  *Continental*, 91 F.3d at 560-62.

"The concept of 'mootness' from a prudential standpoint protects the interests of non-adverse

third parties who are not before the reviewing court but who have acted in reliance upon the plan

as implemented." *Id*. at 562. These factors are melded in *SemCrude*, under which if a plan is substantially consummated the dispositive analysis is "whether granting the relief in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *SemCrude*, 728 F.3d at 320-21.

These factors are discussed jointly because they are intertwined in these cases: third parties will be significantly harmed by the requested relief, because reversal of the confirmation order will be fatal to the global settlement and therefore to the Plan.

Here, the affected non-parties are the 82.98% of Holders of Sexual Misconduct Claims (*i.e.*, other victims of Harvey Weinstein that want closure) and 96% of the Debtors' trade creditors who supported the Plan, along with the other persons and insurers whose compromises and financial contributions helped create a settlement fund. Manifestly, these are parties entitled to protection. *Kainos,* 2012 U.S. Dist. LEXIS 170641, at *10 ("The settlement was a complex and integrated resolution of the many claims involving the parties, and the Court is not persuaded that relief can be granted to Appellant without causing adverse consequences to numerous parties, including general unsecured creditors not before the Court who are still awaiting distributions under the Plan, and whose distributions would be further delayed if the settlement were unwound."); *Paradise Unified Sch. Dist. v. Fire Victim Tr.,* No. 20-cv-05414-HSG, 2021 U.S. Dist. LEXIS 23799, at *17-18 (N.D. Cal. Feb. 8, 2021) ("this appeal threatens to undermine a critical and fundamental settlement provision built into the Plan and would be inequitable to other claimants, shareholders, and investors who relied on the settlement and the enforceability of the Confirmation Order. Accordingly, the Court finds there would be harm to third parties if the Court were to grant Appellants' requested remedy.") (record reference omitted).

**13**

Reversal of the Confirmation Order would dramatically harm those parties by unwinding a settlement that was negotiated over a span of two and a half years, and which provides a meaningful and expeditious recovery to the victims of Mr. Weinstein's abuse, instead of a liquidation that may yield nothing.  As set forth above, a process is already well underway for the resolution of these claims.  A bar date for submitting claims has passed and at least 55 claims have been submitted.  Meetings with survivors have been held and are scheduled.  A review process has begun, which is anticipated to conclude by the end of November.  The goal is to make distributions by years-end (subject to delay if claims determinations are contested).

The relief sought by Appellants would be fatal to the Plan, because the Plan is entirely dependent on the global settlement that would be undone by the elimination of the releases for which the settling parties bargained.  Any suggestion that the releases were unnecessary to the settlement or the Plan is conjectural and illogical.  The evidence was uncontroverted, and the Bankruptcy Court specifically found, that the releases were necessary to both.  Apropos to these cases is the district court's decision in *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 580-81 (D. Del. 2018).

> Debtors argue that a successful appeal, which would result in striking the releases and unwinding the Plan, will harm third parties that have justifiably relied on the Plan, including (i) parties to the global settlement who consummated that settlement; (ii) the Debtors' unsecured creditors, who were granted recoveries otherwise unavailable absent the global settlement and Plan; (iii) the Debtors' vendors, customers, and approximately 1,200 employees, who benefit from the Reorganized Debtors operating as a going concern; and (iv) market participants and investors trading in and relying upon the securities and debt issued pursuant to the Plan. [ ] Voya counters that no legitimate third party reliance interests will be harmed if the releases are stricken, and the only parties who stand to lose anything from a successful appeal are the non-debtor tortfeasors who defrauded Voya. [ ]

14

The Court agrees with Debtors that the releases cannot equitably be excised as they were the very centerpiece of the Plan. The Bankruptcy Court made a specific finding that the releases were the inducement for the Equity Holders' $325 million contribution, and without this contribution, there could not have been the reorganization from which Voya benefited. "Without the releases, there will be no cash contribution to pay the government settlements, and the lenders, including [Voya], would not receive the equity of the company, valued at in excess of $900 million." [ ] The releases shared an "integral nexus" with feasibility of the Plan: but for the Equity Holders' $325 million contribution, there would have been no plan of reorganization, and but for the third-party releases, the Equity Holders would not have made the $325 contribution. *Continental I*, 91 F.3d at 564. Excising the releases in this particular Plan would "knock the props out from under the authorization of every transaction that has taken place" pursuant to the Plan.

*Id.* at 580-81 (record references omitted).  *See also Osram Sylvania, Inc. v. SLI Inc. (In re SLI, Inc.)*, 2006 U.S. App. LEXIS 5188, at *9 ("Because they are consideration for investment that was crucial to the Plan, the releases form an 'integral nexus' with the feasibility of the . . . plan of reorganization.'") (citation omitted).

The Third Circuit's decision in *Tribune* is instructive as to what relief renders an appeal equitably moot, such as undermining a settlement when it is central to a plan, and what does not, such as reallocating a recovery.

To the first concern (fatal scrambling), the Bankruptcy Court noted the obvious: the Settlement was "a central issue in the formulation of a plan of reorganization." *Tribune*, 464 B.R. at 142. Though it is within the power of an appellate court to order the Settlement severed from the Plan and keep the rest of the Plan in place—thereby not attempting to "unscramble the eggs," *Continental Airlines*, 91 F.3d at 566, or turning a court into a "Humpty Dumpty repairman," *In re Pub. Serv. Co. of New Hampshire*, 963 F.2d 469, 475 (1st Cir. 1992), or any other ovoid metaphor—***allowing the relief the appeal seeks would effectively undermine the Settlement (along with the transactions entered in reliance on it) and, as a result, recall the entire Plan for a redo.***

*Tribune Media Co. v. Aurelius Capital Mgmt., L.P.*, 799 F.3d 272, 280-81 (3d Cir. 2015) (emphasis added).  Instructive by comparison was the *Tribune* court's separate holding that an

**15**

appeal by a different party on a different issue, concerning the allocation of a recovery between

two classes, was *not* equitably moot where the relief would not fatally scramble the plan.

> The merits question presented by the Trustees' appeal is straightforward: does the Plan unfairly allocate Class 1E's recovery to 1F? If the answer is yes, disgorgement could be ordered against those Class 1F holders who have received more than their fair share, and the Litigation Trust's waterfall can be restructured to make sure that 1E gets its recovery to the exclusion of 1F. There's no chance that this modification would unravel the Plan: the dispute is about whether one of two classes of creditors is entitled to $30 million in the context of a $7.5 billion reorganization.

*Id*. at 282-83; *cf. One2One Communs., LLC v. Quad/Graphics, Inc*., 805 F.3d 428, 435-36 (3d

Cir. 2015) ("case did not involve a sufficiently complex bankruptcy reorganization such that

dismissal on the basis of equitable mootness would be appropriate" when reorganization involved

a $200,000 investment, one secured creditor owed less than $100,000, only seventeen unsecured

creditors, and no significant business transactions.).

### D. <u>The Public Policy Supporting Finality is Especially Important Here</u>

The final consideration in the *Continental* analysis is the public policy of affording

finality to bankruptcy judgments.  *Continental*, 91 F.3d at 560.  As the Third Circuit explained:

> [W]e should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders.  The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance.  Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.

*Continental*, 91 F.3d at 565.  In *SemCrude,* the Third Circuit expressed that "preserving the

finality of plan confirmation to encourage parties to move forward with plan execution justifies

forbearing the exercise of jurisdiction only where precluding the appeal will prevent a perverse

outcome." *SemCrude*, 728 F.3d at 326.  As the Supreme Court has emphasized, "expedition is always an important consideration in bankruptcy."  *Bullard v. Blue Hills Bank*, 575 U.S. 496, 135 S. Ct. 1686, 1694 (2015).

The Plan is based on a delicately and arduously negotiated settlement, requiring compromise by all parties in interest.  A small minority is dissatisfied with the settlement.  While Appellants are also victims of Harvey Weinstein, their minority position should not be allowed to subvert the will of the vast majority of the creditors.  As the Bankruptcy Court recognized, a defining feature of the Plan was the opportunity for sexual abuse victims to obtain prompt closure in exchange for the compromise of their rights:

> Every victim of Harvey Weinstein was victimized and deserves to have its say into the plan confirmation. And if they choose not to release Mr. Weinstein, they have the right to go and have a jury trial or resolution and closure for them as a result of his abuse. But 83 percent of the victims have expressed very loudly that they want closure through acceptance of this plan, that they do not seek to have to go through any further litigation in order to receive some recovery, some possible recompense for what was done to them; although, it is clear that money alone will never give them that. But I can only deal with the financial aspect of this, and the Bankruptcy Code provides that creditors should decide, as a class, how they want their claims to be treated.  And in this case, both the trade creditors and the tort creditors, have come to a resolution with some recovery for the victims of Mr. Weinstein's terrible conduct.

Hr'g Tr. 116:18-117:8.  The relief sought by Appellants would stymie that bargain, in an emotionally charged context in which a prompt disposition is particularly important.  In fact, that process is already well underway: the Claims Examiners have been in communication with survivors and counsel, a claim deadline has passed and claims have been submitted, and the claims review process is anticipated to conclude by December.  Thus, the public policy supporting finality is an especially important consideration in these cases.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Appellee requests that the David Claimants' appeal be

dismissed in its entirety with prejudice.

Dated:    May 14, 2021                        **PACHULSKI STANG ZIEHL & JONES LLP**

<u>*/s/ Colin R. Robinson*</u>
Robert J. Feinstein (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100

*Counsel for the Appellee / Liquidation Trustee*

DOCS_LA:336957.6 92767/001